1 | **CARMEN A. TRUTANICH**, City Attorney - **SBN 86629x**
**GARY G. GEUSS**, Chief Assistant City Attorney
2 | **CORY M. BRENTE**, Assistant City Attorney
**SUREKHA A. PESSIS**, Deputy City Attorney - **SBN 193206**
3 | Email: Surekha.Pessis@lacity.org
200 North Main Street
4 | 6th Floor, City Hall East
Los Angeles, CA 90012
5 | Phone No.: (213) 978-7036, Fax No.: (213) 978-8785

6 | *Attorneys for Defendants,* **CITY OF LOS ANGELES, JON PETERS, RANDY**
7 | **YOSHIOKA, JASON PRINCE, BRIANNA GONZALES,** and **RAUL BARRON**

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 |

11 | CHEYENNE DESERTRAIN, STEVE   ) CASE NO.: CV10-09053 RGK (PJWx)
JACOBS-ELSTEIN, BRADFORD   ) *Hon. R. Gary Klausner, Ctrm. 850, Roybal*
12 | ECKHART, PATRICIA   ) *Mag. Patrick J. Walsh, Ctrm. 23*
WARIVONCHIK, LEROY BUTLER,   )
13 | WILLIAM CAGLE, TERRY   )
HENDRICKSON,   ) **DECLARATION OF WENDY**
14 |   ) **SHAPERO IN SUPPORT OF**
*Plaintiffs,*   ) **DEFENDANTS CITY OF LOS**
15 |   ) **ANGELES, ET AL'S MOTION FOR**
v.   ) **SUMMARY JUDGMENT OR**
16 |   ) **PARTIAL SUMMARY JUDGMENT**
CITY OF LOS ANGELES, a municipal )
17 | entity, DOES 1-10, as individuals,   ) **(EXHIBITS 1-2)**
   )
18 |   ) [Fed.R.Civ.Proc. 56 (b)]
   )
19 | *Defendants.*   ) [Defendants' Notice of Motion and
   ) Motion for Summary Judgment or
20 | ————————————————   ) Partial Summary Judgment, Separate
Statement of Uncontroverted Material
21 | Facts, Proposed Order, Declarations,
and Exhibits Filed Concurrently
22 | Herewith]

23 | Date:          October 17, 2011
Time:          9:00 a.m.
24 | Courtroom:     850

25 |

26 |          Defendants submit the following Declaration of WENDY SHAPERO in support

27 | of their Motion for Summary Judgment or Partial Summary Judgment.

28 | ///

<div align="center">1</div>

# DECLARATION OF WENDY SHAPERO

I, WENDY SHAPERO, declare:

1.     I am an attorney at law duly admitted to practice before all courts of the State of California and before this Court. I am a Deputy City Attorney at the Office of the City Attorney for the City of Los Angeles, Attorneys of Record for the Defendants in this action. I make this declaration based upon my own personal knowledge and if called upon I would testify thereto.

2.     Attached hereto as Exhibit **"1"** are true and correct copies of pages from the deposition transcript of Jon Peters taken on August 6, 2011 in the instant matter.

3.     Attached hereto as Exhibit **"2"** are true and correct copies of pages from the deposition transcript of Cheyenne Desertrain taken on August 9, 2011 in the instant matter.

4.     Attached hereto as Exhibit **"3"** are true and correct copies of pages from the deposition transcript of Steve Jacobs-Elstein taken on August 9, 2011 in the instant matter.

5.     Attached hereto as Exhibit **"4"** are true and correct copies of the relevant pages of the Verified Responses to Interrogatories by Plaintiff Jacobs-Elstein, Set No. One dated May 3, 2011, in the instant matter.

6.     Attached hereto as Exhibit **"5"** are true and correct copies of pages from the deposition transcript of Bradford H. Eckhart taken on August 16, 2011 in the instant matter.

7.     Attached hereto as Exhibit **"6"** are true and correct copies of pages from the deposition transcript of Patricia Warivonchik taken on August 12, 2011 in the instant matter.

8.     Attached hereto as Exhibit **"7"** are true and correct copies of pages from the deposition transcript of Leroy Butler taken on August 12, 2011 in the instant matter.

9.    Attached hereto as Exhibit **"8"** are true and correct copies of pages from the deposition transcript of William Cagle taken on August 16, 2011 in the instant matter.

10.  Attached hereto as Exhibit **"9"** are true and correct copies of pages from the deposition transcript of Luis Pacheco taken on August 17, 2011 in the instant matter.

11.  Attached hereto as Exhibit **"10"** are true and correct copies of pages from the deposition transcript of Della Franco taken on August 17, 2011 in the instant matter.

12.  Attached hereto as Exhibit **"11"** are true and correct copies of pages from the deposition transcript of Christopher E. Taylor taken on August 11, 2011 in the instant matter.

13.  In an attempt to narrow the legal issues and claims in the present litigation, Plaintiffs' counsel Carol Sobel and I exchanged several emails. The purpose for the emails was to narrow the legal issues Plaintiffs planned to proceed on. Based on the email exchanges, it was understood that Ms. Sobel was abandoning certain causes of action and/or theories in the lawsuit. Accordingly, I did not prepare defenses to those causes of action or theories in the present Motion for Summary Judgment or Partial Summary Judgment. A true and correct copy of the emails between Surekha Pessis and Carol Sobel and Wendy Shapero and Carol Sobel are attached hereto as Exhibit **"12."**

10.  It is my understanding that Ms. Sobel intended to dismiss the claims of Plaintiffs Hendricksen and Garcia and dismiss LAPD Officer Barron. See email from Carol Sobel to Surekha Pessis dated August 23, 2011 at 2:21 p.m. Ms. Sobel offered to draft the stipulation for the dismissal for those plaintiffs and defendant. See email from Carol Sobel to Surekha Pessis dated August 23, 2011 at 3:31 p.m.

11.  Further, Ms. Sobel represented she was not proceeding on the federal ADA and Rehabilitation Act claims or the theory that the exclusion of oversize vehicles

1    from the Rose Avenue parking lot violated the Plaintiffs' constitutional rights.  See

2    email exchanges between Carol Sobel and Wendy Shapero dated August 31, 2011

3    from 6:00 a.m. to 7:08 a.m.

4         12.   Ms. Sobel represented she was not going to challenge the constitutionality

5    of Los Angeles Municipal Code section 41.18(d).

6

7         I declare under penalty of perjury under the laws of the State of California and

8    the United States that the foregoing is true and correct and that this declaration was

9    executed this 13th day of September, 2011 at Los Angeles, California.

10

11   _____

12   WENDY SHAPERO, Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFIED COPY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CHEYENNE DESERTRAIN, et al.,  )
                     )
        Plaintiffs,   )
                     )
  vs.              )   NO. CV 10-09053 RGK (PJWx)
                     )
CITY OF LOS ANGELES, a   )
Municipal entity, DOES 1-10,)
as individuals,       )
                     )
        Defendants.   )
_____)

DEPOSITION OF JON PETERS

Friday, August 26, 2011

Santa Monica, California

REPORTED BY:

JENNIFER J. ANGELOV
CSR NO. 12287

JOB NO.
67870SOB

LUDWIG KLEIN
REPORTERS & VIDEO, INC.
10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681     FAX 818.508.6326
e-mail: lois@ludwigklein.com

EXHIBIT 1 — PAGE 5

1        SANTA MONICA, CALIFORNIA; FRIDAY, AUGUST 26, 2011

2                          10:07 a.m.

3

4                          JON PETERS,

5        having declared under penalty of perjury to tell

6        the truth, was examined and testified as follows:

7

8                          EXAMINATION

9    BY MS. SOBEL:

10       Q    Can you state and spell your name for the court

11   reporter.

12       A    My name is Jon Peters.  First name is spelled

13   J-o-n.  There's no H.  Last name is P-e-t-e-r-s.

14       Q    And am I correct that you're currently a captain

15   with the Los Angeles Police Department?

16       A    You are correct, yes.

17       Q    Now, Captain Peters, I know that you have had

18   your deposition taken before, although I have not taken

19   it, apparently.

20            So can you tell me how many times you've had

21   your deposition taken?

22       A    I can recall at least twice.  Maybe more.

23       Q    And that was -- was it more recently than, say,

24   ten years?

25       A    Let's see.  We're in 2011.  I don't believe so.

1    on vacation and also to attend a training program out of

2    state.  And so I assumed the duties of the acting patrol

3    captain during the time that he was gone.

4         Q    Okay.  And was there some reason why you were

5    only in Pacific Division for three to four months in the

6    initial assignment as lieutenant?

7         A    I applied for and received an upgrade, and I

8    went to Metropolitan division, which was a lieutenant II

9    spot.

10        Q    Now, when you promoted to captain in 2008, July

11   of 2008, where were you first assigned?

12        A    North Hollywood.

13        Q    And how long did you remain at North Hollywood?

14        A    About a year and a half.

15        Q    And after North Hollywood, where were you

16   assigned?

17        A    I was upgraded to a captain III and assigned to

18   Pacific as the area commanding officer.

19        Q    And when did you begin at Pacific Division then?

20        A    I believe it was January of 2010.

21        Q    Must have been really bad news that you have to

22   meet with me right after becoming the captain III.  I was

23   just looking at the date.

24        A    It wasn't bad news at all.  It was --

25        Q    You were pretty quiet in that meeting.

14

1      Q      And what were those skill sets that were better

2    suited?

3      A      I don't know, ma'am.  You'd have to ask

4    Chief Albanese.

5      Q      Okay.  Did he say anything to you about why they

6    had made the decision to change assignments?

7      A      No, ma'am.

8      Q      Now, after you learned that you were being

9    assigned as the area commanding officer of Pacific

10   Division, did you have any discussions with anyone in the

11   department about specific issues that Pacific Division

12   needed to address regarding homeless individuals in the

13   area?

14     A      Not to my recollection.

15     Q      Did you have any discussions with anyone -- any

16   public official not in the department about homeless

17   issues?

18     A      Can you be more specific as to a time frame.

19     Q      After you were assigned to -- in the initial

20   month after you were assigned to Pacific.

21     A      Yeah.  Initially when I was assigned, I was -- I

22   don't know if "invited" would be the right word --

23   directed to be at some meetings.

24     Q      If you're talking about Mr. Rosendahl, it would

25   be directed.

1      Q     I can rephrase it.

2      A     Yes, please.

3      Q     All right.  After that initial meeting with

4   Mr. Rosendahl, did you direct anybody in Pacific Division

5   under your command to do anything regarding the issues

6   that had been discussed that day?

7             MS. PESSIS:  At any time or --

8             MS. SOBEL:  No.  Just after the initial meeting.

9             MS. PESSIS:  Okay.

10            THE WITNESS:  If you'd allow me to give a little

11   bit of a narrative --

12            MS. SOBEL:  Sure.

13            THE WITNESS:  -- I think I can -- and again, I

14   don't quite recall the timing.

15            But one of the things that I did very -- almost

16   immediately after I had arrived there was to take the

17   time to meet with all the senior lead officers.

18            And I did a ride-along with each senior lead

19   officer, spent a couple hours with them in their

20   communities and their neighborhoods trying to understand

21   what their issues were, what their challenges were.

22            Community -- meeting people in the community

23   that were people that they thought that I should know.

24   So I did that.

25            And in doing that, meeting with the two senior

21

```
 1    lead officers from what we call Basic Car 14A11, which is
 2    the Venice Beach area, and 14A13, which is the adjacent
 3    community of Oakwood, I listened at length to the
 4    challenges that Officer Skinner and Officer Thusing were
 5    dealing with, in addition to their sergeant,
 6    Sergeant Jeff Merlo, to get an understanding of the
 7    issues that were topical.
 8            So that was kind of happening simultaneously as
 9    I was attending these community meetings.  And so that's
10    how all of the information was kind of coming to me.
11    BY MS. SOBEL:
12        Q    Other than the oversized vehicle parking issue
13    that you've described, what were the other topical issues
14    that you learned about from this information that you
15    gathered, particularly regarding people believed to be
16    homeless?
17        A    Well, it was -- it was basically a couple things
18    that -- in kind of drilling down on the problem, it
19    appeared that we had an issue of a large criminal
20    transient population that was contributing to an increase
21    in crime in the area and also was -- along with a
22    nuisance vehicle issue that -- both of which were
23    impacting what we would refer to as quality-of-life
24    issues.
25            That was primarily what the discussion was
```

1    about.

2        Q    Okay.  And can you describe the nuisance vehicle

3    issue in more detail?

4        A    That we had large vehicles that people were

5    living in that were parking on the streets, that were

6    responsible for disturbing residents, that were

7    responsible for trash and debris, you know, in addition

8    to -- well, that's pretty much it.

9        Q    And so based on what you learned from --

10       A    Can I backtrack just --

11       Q    Sure.

12       A    I believe your question was specific to the

13   nuisance vehicles?

14       Q    Yes.

15       A    Okay.  Then I'm good.

16       Q    Okay.  Was there any other issue you learned

17   about regarding vehicles that were believed to be --

18   belong to people who were homeless?

19       A    Not -- not with regard to vehicles.  But there

20   was another pressing issue that we were very concerned

21   about.

22            And that went more to an influx of younger

23   transients that had come to Venice and had stayed in

24   Venice that we believed to be involved in a lot of

25   criminal activity and in many instances were preying on a

23

JON PETERS - August 26, 2011
DESERTRAIN VS. CITY OF LOS ANGELES

1    lot of our traditional homeless.

2             As I was informed by Officer Skinner and

3    Officer Thusing and Sergeant Merlo, this phenomenon was

4    something they had seen in the past where a lot of these

5    kids would come from Northern California, Washington and

6    Oregon and would travel the coast.  It was a lifestyle

7    choice.

8             And they would pass through Venice and stay for

9    a while, and then they would leave.  They would head as

10   far south as San Diego, and then they'd kind of make

11   their way back through.

12            But what had happened is that they had decided

13   to settle in Venice.  And so that was also one of the

14   issues that we were focused on.

15   Q    And when you used the term -- you called them

16   younger transients, and you used the term "kids."

17            Was there a particular age range that

18   Officers Thusing and Skinner had observed?

19   A    Yes.  And subsequently I had the time to observe

20   them myself.

21            But it was basically -- I call them kids.  You

22   know, 18 to 25ish.  They were very communal in nature.

23   Sleeping under the bridges, you know, on the boardwalk,

24   on the beach, in the pagodas, on top of each other, close

25   proximity to each other.

```
 1      Q     That was, based on everything you had learned, a

 2   very distinct issue from the other issue you described

 3   about people in vehicles.

 4      A     I think in some situations they were

 5   intertwined.

 6      Q     Okay.  Now, after you did all of these

 7   ride-alongs and met with everybody, based on all the

 8   information you had obtained, did you -- did you direct

 9   anyone in Pacific Division to do anything with regard to

10   the problems you've identified?

11      A     Well, what I did is I asked the two senior lead

12   officers and the sergeant what they needed from me, how

13   could I help them with the situation.

14            And their recommendation was that I assign

15   additional officers to that area to basically supplement

16   what the senior lead officers were doing day in and day

17   out; that they were, quite frankly, overwhelmed with.

18            And so that we would have a continuing presence

19   even on those days when the senior lead officers were

20   off.

21            So that's how -- that's how that part of it

22   started.

23      Q     Okay.  And when you say "that part of it

24   started," can you tell me what you're talking about?

25      A     Assigning additional officers basically to that
```

```
 1   area.

 2       Q     And did you ultimately assign additional

 3   officers?

 4       A     Yes.

 5       Q     And when did you do that?

 6       A     That's a good question.  I don't want to guess.

 7   I want to -- I'm going to estimate it was roughly around

 8   March of 2010 or so.

 9       Q     And those additional officers, where did they

10   come from?

11       A     Patrol.

12       Q     They were already assigned to Pacific?

13       A     Yes.

14       Q     Patrol.

15       A     Yeah.  It was just reallocation of resources

16   within my command.

17       Q     At any time -- did you give those officers any

18   special assignments based on their reassignment to I

19   guess work with the two senior lead officers and the

20   sergeant you've identified?

21       A     That was the assignment.

22       Q     How many officers did you reassign from patrol

23   at that point?

24       A     I don't recall exactly.  I want to say it was

25   four to start.  And I believe at some point pretty
```

1    quickly it went up to six.

2        Q    Now, at some point you said you had talked to

3    Councilmember Rosendahl about the Streets to Homes plan

4    he had -- his concept, I believe was the word you used.

5        A    Yes.

6        Q    Okay.  And did you do anything, after the time

7    that you became the commanding officer of Pacific

8    Division and learned of Mr. Rosendahl's concept, to

9    implement the concept?

10       A    Yes.

11       Q    And what did you do?

12       A    Well, a couple things.  The one thing that

13   Mr. Rosendahl and I were in agreement on is that we both

14   believed, and I still believe, that we were not going to

15   arrest our way out of a problem that we were experiencing

16   and wanted to provide a comprehensive approach that

17   included, in the most simplest terms, being in a position

18   to provide help to people who needed help and wanted

19   help.

20            So I was doing some things on my side within my

21   command with the resources I had to help that and move

22   that piece forward.  And that included supporting

23   whatever we could with the Streets to Homes program.

24            So initially what had happened was the

25   councilman assembled a working group of about six people,

1    community members that I believe that he believed were on

2    opposite sides of the issue in Venice.  I was a part of

3    those meetings.

4            We, as a group, agreed to research some of the

5    other municipalities in areas that had a similar program

6    in place to see how that was working and to see what we

7    could take from them and learn so that we could implement

8    something similar in the Venice area.

9            I sent officers on a -- sort of a field trip, if

10   you will, an investigative trip, to the City of

11   Santa Barbara with that group to look at it collectively

12   and to identify some best practices and things like that.

13           I directed officers and supervisors to reach out

14   to Eugene, Oregon and get an understanding for the

15   program that they had there and, again, to identify best

16   practices.

17           There was another jurisdiction in Orange County,

18   one of the beach communities down there -- and I don't

19   remember which one now.  It escapes me -- that had a

20   similar program.

21           So those were some of the things that we were

22   actively involved in.

23           In addition, I -- I believe that you're pretty

24   well versed on the initial proposal, but the idea was to

25   identify parking lots.

1    Q    Uh-huh.

2    A    And so we were actively involved in trying to

3    identify parking lots that we believed would work,

4    even -- even up till fairly recently where there was a

5    lot of consternation over the fact that there had not

6    been a parking lot identified in the Venice community.

7         And that was an issue for a lot of the people

8    that identified Venice as their home and wanted to be in

9    a position where they could use social services that were

10   in Venice.

11        And so we worked very hard to provide our best

12   recommendations to the council office on locations that

13   we thought would work there.

14   Q    And where is -- is there now a parking lot in

15   Venice?

16   A    Well, we recommended several.  And I think that

17   the one that the council office had proposed was the

18   Penmar Golf Course area.

19   Q    Is that now available to people to park

20   overnight?

21   A    I don't believe it is, no.

22   Q    And what were the other locations you

23   recommended besides Penmar park -- Golf Course?

24   A    There was several.

25   Q    Do you recall any of them?

1   able to arrest your way out of this.

2          Do you recall that?

3      A    Yes.

4      Q    And that you wanted to develop -- that there

5   needed to be developed a comprehensive approach of being

6   able to provide help, right?

7      A    Yes.

8          (Whereupon, Ms. Desertrain exits the deposition

9      proceeding.)

10  BY MS. SOBEL:

11     Q    What did you do, if anything, regarding a

12  comprehensive program to provide help?

13     A    Well, what we did is we -- when I got to

14  Pacific, there was a clergy council -- Pacific area

15  clergy council that was operational.

16         It was consistent with most of the other 21

17  geographic areas.  They -- most all of them have a --

18  some sort of a clergy council.

19         The clergy council, in working with

20  Sergeant Merlo, had an idea of trying to help with the

21  situation.  Based on their expertise, experience in their

22  churches, that they had resources that they had used in

23  the past and resources that they were aware of that they

24  were willing to kind of coordinate, put that information

25  together, and help us to be able to assist people that

```
 1   wanted help and needing help by directing them to social

 2   services that could assist them.

 3       Q    And were there particular -- did you ever meet

 4   with the clergy council?

 5       A    Yes, ma'am.  Many times.

 6       Q    And were there particular individuals -- how

 7   many people were at the -- on the clergy council, to your

 8   knowledge?

 9       A    Maybe 12 or so.
```

```
10       Q    Do you remember who they were?

11       A    I don't know that I could tell you all of their

12   names, but I know several of them.

13       Q    Can you tell me who you recall?

14       A    Henry Lazo is the coordinator.

15            MS. PESSIS:  Can you spell the last name for us.

16            THE WITNESS:  I believe it's L-a-z-o.

17            MS. PESSIS:  Thank you.

18            THE WITNESS:  Pastor J.D. Webster.  Pastor Steve

19   Weller and his wife.  Pastor Ed Donnelley.

20            And there's several others.  I just don't recall

21   their names.

22   BY MS. SOBEL:

23       Q    And do you recall what institution Henry Lazo

24   was affiliated with?

25       A    I don't.
```

1   document marked as Exhibit 1.

2        Do you recognize that document?

3   A   I don't.

4   Q   Have you ever seen any document that -- we've

5   had testimony in this case by Officer Gonzales and

6   Officer Yoshioka that, in a slightly different version,

7   they handed out a local outreach resource information

8   packet to people.

9        You've never seen such a document?

10  A   You asked me if I've seen this document.  I

11  don't recall seeing this.  I mean there's parts of this

12  that I believe that I've seen before.

13  Q   Okay.  Can you indicate to me which parts you

14  think you've seen before?

15  A   The first page.

16  Q   And that's -- let's give it some identification.

17       That's the page marked --

18  A   "Community Alert."

19  Q   -- "Community Alert."

20       Okay.

21  A   The information relative to the St. Joseph

22  Center I've seen before -- I recall seeing before.

23       The difficulty for me is there's two documents

24  that I recall seeing.  One of them I believe was more of

25  a one-page type of thing that had a number of resources

38

```
 1    listed.
 2            And then the other was kind of a pink maybe
 3    tri-fold pamphlet, if you will, that had resource
 4    information.
 5            That's what I recall seeing.
 6       Q    Okay.  And do you recall what type of resources
 7    were listed on the one-page document you saw?
 8       A    Similar to what's in here.  Veterans
 9    information, St. Joseph's Center information, Sojourn
10    Cold Weather Shelter.  I mean all -- you know, local food
11    bank.
12            Basically the same type of information.
13       Q    And on the pink tri-fold was there different
14    information from what you've just described on the
15    one-page resource?
16       A    I believe what came out of that pink tri-fold
17    was updated and more current information as to what was
18    initially put together.
19       Q    And would you say --
20       A    It was the same type of information.
21       Q    And so it's your recollection that the pink
22    tri-fold document is updated information from the
23    one-page resource document you recall?
24       A    That's my recollection.
25            And I think that there's even a -- even a more
```

EXHIBIT 1 - PAGE  21

1    current version than that now that the clergy council has

2    put together.

3              MS. SOBEL:  Okay.  Counsel, can you get those

4    documents for us?

5              MS. PESSIS:  I will look into that.  I was not

6    aware of them.

7              MS. SOBEL:  I appreciate that.  But now that the

8    captain has identified them.

9         Q    Do you know who has possession of those

10   documents or copies of those documents?

11        A    I believe Henry Lazo maintains those documents.

12   Henry is the coordinator, if you will, of the clergy

13   council from the civilian side.

14             MS. PESSIS:  Okay.

15   BY MS. SOBEL:

16        Q    So these are documents handed out by the clergy

17   council?

18        A    Sometimes they do hand them out, yes.  Yeah.

19   The clergy council currently goes out with our

20   officers -- or members of the clergy council goes out

21   with our officers, I believe it's every other week now,

22   to do outreach.

23             And in doing that, they do distribute this type

24   of resource information.

25        Q    To your knowledge, does the police department

40

```
 1   also distribute those two documents you've described, the

 2   one-page resource and the pink tri-fold?

 3        A    I believe they do, yes.
```

```
 4        Q    And have you directed anyone to prepare any kind

 5   of reports for you on the results of the distribution of

 6   the information you recognize in Exhibit 1 and the two

 7   documents you've described that Henry Lazo coordinates?

 8        A    Well, there's a couple of answers to that.

 9             First of all, it's my expectation that every

10   officer at Pacific Division has some understanding as to

11   the resources that are available in the community that

12   they can provide to people in the course and scope of

13   their duties if the situation arises.

14             And in terms of tracking that -- how often

15   that's handed out and provided, I don't have a system in

16   place to capture that.

17             As it goes to the clergy council, when they go

18   out on their outreach days, they do provide a

19   documentation of how many people they contacted and

20   provided information to, how many people they were able

21   to place into shelters and that type of thing.

22        Q    And who do they provide that information to?

23        A    They provide it to Sergeant Merlo.

24        Q    And is that part of the Venice homeless task

25   force outreach program?
```

41

1       A     It's part of our outreach efforts, yes.

2             MS. SOBEL:   I actually think that's responsive

3   to the request for documentation on the task force.

4             MS. PESSIS:   Okay.   So what are we calling the

5   document?

6             MS. SOBEL:   Clergy council --

7       Q     What do you call it?

8             MS. PESSIS:   We'll ask the witness.

9             THE WITNESS:   Again, as I had spoken about

10  initially, a lot of this has been a work in progress.

11            I think -- well, I know that initially, where a

12  lot of the contacts were being made, that information

13  wasn't being captured.

14            So, you know, it was my expectation that we

15  start capturing that information and doing it.   So they

16  have some of that put together now.

17  BY MS. SOBEL:

18      Q     When did you -- I'm sorry.   Go ahead.

19      A     In terms of what the official name of the

20  document is, I don't know.   It's an outreach recap sheet.

21  I don't know.

22      Q     Would Sergeant Merlo have that document?

23      A     He would either have it or have access to it.

24            I also know that an officer that worked for him,

25  Tony Newsom, often provided e-mails to Sergeant Merlo

                                                            42

1    A    I don't remember.

2    Q    Do you recall approximately when this discussion

3    took place?

4    A    I don't.  It was -- there was a number of

5    discussions about how I believed that we could improve

6    what we were doing.  So they were ongoing.

7    Q    Were there other discussions -- other ideas you

8    conveyed to the clergy council about how you could

9    improve what you were doing?

10    A    Yes.

11    Q    What were they?

12    A    Well, one of the things that -- and I don't know

13    if it was my specific idea or came out of a group

14    discussion, was to put together hygiene kits that we

15    could distribute while we were out making contact with

16    folks that needed help.

17          So that's been done, and those are distributed.

18          The other thing was I remember having

19    discussions of was -- a situation, especially during the

20    wintertime, where officers would bring in clothing and

21    the churches from their communities would bring in

22    clothing that we could help to distribute to the homeless

23    people.

24          And basically the -- the commitment was, to the

25    best of our ability, we wanted to be able to provide help

45

```
 1    to every single person that needed help and asked for it.

 2             And to my knowledge, we've been able to do that

 3    except for two instances that I'm still working on.  And

 4    they involve a couple of women who have dogs, and they

 5    don't want to be separated from their animals.

 6             And so we've -- trying very hard to help to find

 7    a place that will take them with their animals.

 8        Q    Now, when you -- are those two women homeless at

 9    the moment?

10        A    Yes.

11        Q    And is there a particular area of the City of

12    Venice that they stay in?

13        A    I don't know that they just stay in Venice.  I

14    think they move around, is my recollection.

15        Q    So when you talk about providing help to people

16    who need help and want help, has the department assisted

17    in getting housing for any of the individuals who have

18    made contact with them, the outreach?

19        A    Yes.

20        Q    And on how many occasions do you think that the

21    department has succeeded in getting housing for people?

22        A    When you say "the department," are you speaking

23    about the whole LAPD, or are you speaking about Pacific

24    Division?

25        Q    I'm just talking about Pacific Division.
```

```
 1      A     Since we got involved in this, it's probably
 2   around ten or so.  I know of at least two or three
 3   occasions where I've been personally involved that we've
 4   been able to do that.
 5      Q     Uh-huh.  And on the two or three occasions where
 6   you've been personally involved and able to do it, where
 7   did you get the housing?
 8      A     I don't know specifically what place they went
 9   to.  What I did is, upon making contact with these
10   individuals and them expressing to me that they needed
11   help and wanted help, I called -- on one occasion I
12   called Pastor Ed Donnelley, who responded very quickly to
13   the station and took the individual and was able to get
14   him placed.  I don't know where it was.
15            On a second occasion I was meeting with those
16   two women that I had talked about earlier and trying to
17   figure out what we could do to help them.
18            And they identified to me a third homeless woman
19   that was in need of help.  I called Pastor Steve Weller.
20   He responded very quickly and was able to take her and
21   place her at a location.  And again, I don't know which
22   one it was.
23      Q     So just to be clear, when you say get housing,
24   are you talking about getting somebody an apartment?
25      A     Again, I don't know specifically where they were
```

47

1           MS. SOBEL:   Uh-huh.

2           THE WITNESS:   --. in terms of knowing what we

3    were doing.   I think all they knew was that there were

4    problems, and they needed more people.

5           And that was the nature of the request.

6           MS. SOBEL:   I appreciate that, Captain.   But I

7    think we're entitled to the e-mails.

8      Q    Did you receive --

9      A    Certainly.

10      Q    -- copies of the e-mails?

11      A    I believe that I did in many situations.

12    There's a number of people that were copied, from the

13    chief of police on down the list.

14      Q    Okay.   And as a result of those e-mails or in

15    relationship to those e-mails, not necessarily a direct

16    correlation, you made this request for the chief of

17    police adjustment, correct?

18      A    Well, no, ma'am.

19           I made the request because of the crime issues

20    that I was dealing with in that community and the

21    significant increase in crime that I was very concerned

22    about.

23      Q    Okay.   How -- do you have any knowledge about

24    how members of the community knew to send e-mails to the

25    chief of police regarding keeping officers permanently --

JON PETERS - August 26, 2011
DESERTRAIN VS. CITY OF LOS ANGELES

1           But beyond any that -- well, I'll put it to you

2       this way:  I have seen none that pertain to your client

3       other than the one from Della Franco.

4           I'm not saying that none exist.  I'm saying I've

5       seen none.

6           MS. SOBEL:  Right.  Doesn't matter because we've

7       alleged a policy.  It's all relevant to what they got,

8       what they responded to.  It doesn't matter.

9           MS. PESSIS:  Well, I think there would be also a

10      time limitation, too.  I mean the task force was formed.

11          If you're saying just -- if you are assuming

12      e-mails resulted in the formulation of a task force, I

13      think he's answered that.

14          Then the request for production No. 1, my

15      reading of it, and with which you may disagree, I think

16      relates to documents concerning the incidents in the

17      complaint.

18          MS. SOBEL:  Well, I disagree.

19          MS. PESSIS:  But I will --

20          MS. SOBEL:  I disagree, and you're not supposed

21      to interpret it that narrowly.

22          But let me ask the witness a question.

23          MS. PESSIS:  Sure.

24      BY MS. SOBEL:

25          Q    Did you have any e-mail communications with

```
 1    Captain Crump about the formation of the task force --

 2    the Venice homeless outreach task force prior to its

 3    initial operation?

 4         A    I don't believe so.

 5         Q    Did you have any e-mails with anyone else in the

 6    department?

 7         A    About the task force?

 8         Q    Yeah.

 9         A    I don't believe so.  I think it was mostly

10    face-to-face type of conversations.

11         Q    And how many e-mails do you think you've gotten

12    from community members concerning vehicle complaints and

13    other issues you just described?

14         A    A lot.  I continue to get one weekly from a

15    member of the community.
```

```
16         Q    And when you -- and do you save those in a

17    specific file on your computer?

18         A    No.

19         Q    Do you sort your e-mail at all?

20         A    I do.

21         Q    And is there a sort that you use for the

22    complaints that come in from citizens about vehicles in

23    Venice?

24         A    No.

25         Q    So they're just in your general e-mail box.
```

1  request for a chief of police adjustment to have

2  additional officers remain in Venice after the summer

3  when you've already described additional officers are

4  pulled from other divisions?

5      A    That -- yes.  That was what we were attempting

6  to do.

7      Q    Okay.  And were you successful in getting that

8  chief of police adjustment?

9      A    Kind of.  If you ask the people at OO, office of

10 operations, they will say that I do have the bodies.

11     Q    Chief Paysinger will say that about anybody.

12     A    My count is I'm a little short.

13     Q    Okay.

14     A    But having said that, I have committed a number

15 of resources to the -- what we now call the

16 Oakwood-Venice Task Force that has a number of components

17 to it.

18          Some of those are loan bodies that have been

19 given to me for an extended period of time that I have to

20 renew annually the request, and it's reviewed by the

21 department.

22          And some of them are my own internal resources

23 that I've just reallocated their -- their duties or

24 increased their -- their mission and their area of

25 operation.

JON PETERS - August 26, 2011
DESERTRAIN VS. CITY OF LOS ANGELES

1    would have been the end of August or beginning of

2    September.

3               Is that consistent with your recollection?

4       A    Well, not necessarily.

5               Again, I think that the Councilmember maybe

6    didn't understand in terms of what we were referring to

7    as the task force and his understanding of what it was.

8               Again, initially when this whole thing started

9    back in March, it consisted of four or six officers I

10   think that we were calling the Venice task force.

11              But certainly by end of August, September, it

12   had taken on a whole different connotation in terms of

13   that term.

14              So I don't know what Rosendahl -- I think --

15   when he was saying that, I think what he was aware of is

16   that we had additional officers assigned to the area.

17      Q    Okay.  So how did -- how did the connotation

18   change by August, September from the initial four to six

19   officers?

20      A    Well, what had happened is crime continued to go

21   up.  And I was not comfortable that we were doing

22   everything that we possibly could to address the issues

23   of crime in the community.

24              So we brainstormed what we had available to us

25   and what we could do to have a greater impact.

1          So we started by identifying an operational area

2     that we wanted to focus on.  And basically those

3     boundaries were -- the southern boundary was Washington

4     Boulevard that extended to the Santa Monica border, which

5     was roughly Rose.  And then from Lincoln Boulevard west

6     to the ocean.  That was pretty much the operational area

7     that we wanted to focus on.

8          The other thing that I wanted to ensure is that,

9     to the best of our ability, that we could have a

10    consistent presence out there seven days a week.  And the

11    hope was to be able to cover about 23 hours a day and to

12    have a combined group of uniformed officers on bike

13    patrol and also a special operations for undercover

14    component in addition to the outreach efforts that we

15    were doing.

16    Q     And who was doing the outreach efforts; anybody

17    but your officers and the clergy council?

18    A     Those were the people that were doing it.

19    Q     Okay.

20    A     Correct.

21          And basically at -- initially when they started,

22    you know, they were working under the direction of

23    Sergeant Merlo.

24          And when we rolled into this more comprehensive

25    type of task force, they became under the supervision of

JON PETERS - August 26, 2011
DESERTRAIN VS. CITY OF LOS ANGELES

1          MS. SOBEL:  No.  I'd rather ask the question.

2     Q    Do you know who sent this e-mail that appears to

3    be from Brenda Crump?

4          MS. PESSIS:  Do you mind showing it to him?

5          MS. SOBEL:  Sure.

6          MS. PESSIS:  If that's okay.

7          MS. SOBEL:  Let's mark this as Exhibit 3, I

8    believe.

9          MS. PESSIS:  Thank you.

10         (Exhibit 3 was marked for identification by

11      the certified shorthand reporter.)

12         THE WITNESS:  Is there a question?

13         MS. SOBEL:  I'll withdraw the last question.

14         THE WITNESS:  Okay.

15   BY MS. SOBEL:

16    Q    Do you recognize the document that's been marked

17   as Exhibit 3?

18    A    I recognize the operational plan piece of it.

19   The e-mail cover, I don't recollect that.

20    Q    Okay.  The e-mail indicates it was sent to

21   command, detective IIIs, detectives, lieutenants, Pacific

22   SLOs, and then somebody else --

23    A    Right.

24    Q    -- that's cut off.

25         Would you have fallen into any of those

```
 1    categories listed in the two areas?

 2        A     I don't know.

 3        Q     Do you recall ever receiving a copy of an e-mail

 4    from Captain Crump with the operational plan attached?

 5        A     No.  I got my own hard copy of the operational

 6    plan.  I don't remember getting an e-mail from her.

 7        Q     Okay.

 8              All right.  And is the hard copy of the

 9    operations plan that you've got the same as the document

10    attached to the face page e-mail on Exhibit 3?

11        A     I believe it is the same, yes.

12        Q     And this e-mail is dated October 13th, 2010 and

13    states that the Oakwood-Venice Task Force was started on

14    DP 11.

15              Is that consistent with your recollection of

16    when that task force began?

17        A     Well, yes and no.  I mean that's roughly right.

18    We started with -- again, it was an ongoing process.  We

19    started with kind of a hybrid model.

20              But yeah.  If you wanted to use kind of an

21    official kickoff timeframe, that would be pretty close.

22        Q     Okay.  Thank you.

23              And now you've indicated that you have this

24    four C philosophy.

25        A     Yes.
```

85

# Local Outreach

# Resource

# Information

## LAPD PACIFIC DIVISION



EXHIBIT 1 - PAGE 36



## COMMUNITY ALERT

### PACIFIC AREA
### LOS ANGELES POLICE DEPARTMENT
### OFFICIAL PUBLICATION OF THE PACIFIC AREA CRIME ANALYSIS DETAIL

#### WARNING OF ENFORCEMENT ACTION

**SEC. 85.02. USE OF STREETS AND PUBLIC PARKING LOTS FOR HABITATION.**

No person shall use a vehicle parked or standing upon any city street, or upon any parking lot owned by the City of Los Angeles and under the control of the City of Los Angeles or under control of the Los Angeles County Department of Beaches and Harbors as living quarters either overnight, day by day, or otherwise. (Title and Section Amended by Ord. No. 158,219 EFF. 9/19/83.)

Should you have any questions, please contact the Pacific Area Watch Commander at 310-482-6334.

3-24-10 Homeless Outreach

1-2

EXHIBIT 1 – PAGE 37

# Women's/Child Care Health Services

**Venice Family Clinic**

**Location:** Venice Family Clinic
604 Rose Ave.
Venice, CA. 90291

Venice Health Center
905 Venice Blvd.
Venice, CA. 90291

Venice Family Clinic or Burke Health Center
2509 West Pico Blvd.
Santa Monica, CA. 90405

**Telephone #:** (310) 392-8636 (centralized call center for appointment at any of the three facilities)

**Eligibility:** Uninsured individuals (children, adolescents and adults) who have incomes below 200% of the federal poverty guidelines and who live in the West Health District of Los Angeles County.

**Services Offered:** Comprehensive women's health care such as annual pelvic exams and pap smears; breast exams and referrals for mammograms; family planning and prenatal care. Social work services such as crisis intervention for domestic violence and other psychosocial issues. HIV prevention programs and early Head Start Programs.

## *Women's Sober Living*

THIRD STEP RESIDENCE, INC.
1036 W. 107th Street
Los Angeles, CA 90044
T: 310-749-6365
F: 213-947-4946

## *Sojourn Services-Battered Women*

1453 16th St
Santa Monica, CA 90404
(310) 264-6644

EXHIBIT 1 – PAGE 38

# Additional Resources



### *Bible Tabernacle*

1761 Washington Way

Venice, CA 90291

(310)821-6116

### *Bread & Roses Cafe*

Meals Available with

Vouchers from St. Joseph's Center

(404 Lincoln Bl, Venice CA 90291)

### *Cold Weather Shelter ("Night Bus")*

December 1-March 12, 2010

Pick-up at Pacific Ave/Westminster Ave (Dog Park)

Pick-up time: 4:30 p.m. and 6:30 p.m.

***Overnight Stays Only***

EXHIBIT 1 – PAGE 39

# Local Food Banks/Soup Kitchens



Accufood   (818) 887-3988
6459 Independence Ave Woodland Hills, CA 91367

Woodland Hills Food Banks

Apla Food Bank   (818) 255-0080
7336 Bellaire Ave North Hollywood, CA 91605

North Hollywood Food Banks

Childrens Fund   (818) 895-6001
8641 Sepulveda Blvd North Hills, CA 91343

North Hills Food Banks

Miguel Angel Hot Dogs   (323) 474-4292
1571 Baxter St Los Angeles, CA 90026

Los Angeles Food Banks

Neighbors Helping Neighbors   (562) 777-2475
13513 Telegraph Rd Whittier, CA 90605

Whittier Food Banks

Orange County Food Bank   (714) 897-6670
12640 Knott St Garden Grove, CA 92841

Garden Grove Food Banks

Valley Food Bank the   (818) 785-4476
13422 Saticoy St North Hollywood, CA 91605

North Hollywood Food Banks

Westside Food Bank   (310) 828-6016
1710 22nd St Santa Monica, CA 90404

Santa Monica Food Banks

World Harvest Foodbank   (213) 746-2227
1014 Venice Blvd Los Angeles, CA 90015

Los Angeles Food Banks

1-5

EXHIBIT 1 - PAGE   40

# People Helping People



5701 S. San Pedro St.
Los Angeles, CA 90011
Ph: 323. 521 1740
Alt: 323. 232 7956

## Homeless Services

*Bridges of Hope*

*Intensive Case Management*

*S.T.E.P.S*

*Permanent Housing Placement*

*Emergency Shelter*

*Family Motel Vouchers*

*Family Motel Vouchers*

*Street Outreach*

*Emergency Shelter*

*Winter shelter*

*Street Outreach*

1-6

EXHIBIT 1 — PAGE 41





Beverly Clinic (near the Beverly Center)
8405 Beverly Blvd.
W. Hollywood, CA 90048
(medical, dental, legal, psychological)

Hollywood Wilshire (east of Paramount Studios)
Health Center
5205 Melrose Avenue
Los Angeles, CA 90038 (medical)

Hollywood Center
6043 Hollywood Blvd.
Los Angeles, CA 90028 (medical)

Venice Family Clinic
604 Rose Ave.
Venice, CA 90293
Appointment Line: 310-392-8636
(medical and dental. )

Burke Health Center
2509 Pico. Blvd.
Santa Monica, CA 90405
Appointment Line: 310-392-8636
(medical, possibly dental)

Westside Family Health Clinic
1711 Ocean Park Ave.
Santa Monica, CA
310-450-2191
(medical)

Venice Health Care Center
905 Venice Blvd.
Venice, CA 90291
Appointment Line: 310-392-8636
(medical, possibly dental)

Les Kelley Family Health Center
1920 Colorado Blvd.
Santa Monica, CA 90404
310-319-4700
(medical, sliding scale fee)

# *Local Area Veteran's Centers and Hospitals*



**West Los Angeles Vet Center**
5730 Uplander Way Suite 100
Culver City, CA 90230

**Los Angeles Veterans Resource Center**
1045 W. Redondo Beach Blvd. Suite 150
Gardena, CA 90247

**East Los Angeles Vet Center**
5400 E. Olympic Blvd. #140
Commerce, CA 90022

**Sepulveda Vet Center**
9737 Haskell Ave.
Sepulveda, CA 91343

*All Vet Centers: 1-866-496-8838*

**West Los Angeles Healthcare Center**
11301 Wilshire Blvd.
Los Angeles, CA 90073
Phone: (310) 478-3711

*VA Suicide Prevention:  1(800) 273-8255*

## HOMELESS SERVICE CENTER REFERRAL CARD

This is to introduce:

_____

(Name)

Who is interested in the following services:

- [ ] FOOD
- [ ] CLOTHING
- [ ] SHELTER REFERRAL
- [ ] SHOWER
- [ ] LAUNDRY
- [ ] MAIL
- [ ] PHONE
- [ ] JOB REFERRAL
- [ ] MONEY MANAGEMENT
- [ ] MEDICAL REFERRAL
- [ ] DENTAL REFERRAL
- [ ] ASSISTANCE WITH BENEFITS
- [ ] PSYCHOLOGICAL SERVICES
- [ ] DRUG OR ALCOHOL TREATMENT
- [ ] COMMUNITY GROUPS/SEMINARS
- [ ] OTHER _____

Date: _____

Referred by: _____

(Outreach Staff)

## ST. JOSEPH CENTER PROGRAMS

For homeless clients:
- Bread and Roses Café
- Homeless Service Center (HSC)
- Affordable Housing Program

For low-income, housed clients:
- Family Center and Food Pantry

For both homeless and low-income, housed clients:
- Child Care and Parenting Program
- Culinary Training Program
- Housing Assistance Program
- Infant Toddler Development Center
- Monetary Advisory Program
- Veterans' Representative Payee Program
- Senior Outreach Program
- Thrift Store

St. Joseph Center
204 Hampton Drive
Venice, California 90291
Phone: 310-396-6968x7,x5
FAX:  310-399-3040
www.stjosephctr.org

St. Joseph Center is an
independent 501(c)(3) organization
affiliated with the
Sisters of St. Joseph of Carondelet.



# HOMELESS SERVICE CENTER (HSC)



EXHIBIT 1 – PAGE   44

## HOMELESS SERVICE CENTER

Homeless Service Center
371 Rose Avenue
Venice, California 90291
Outreach Number 399-6878 x 4#
FAX:    310-399-1339
www.stjosephctr.org

*The Homeless Service Center (HSC) exists to address the needs of all persons who are homeless or at risk of becoming homeless. It is our mission to provide comprehensive supportive services by offering advocacy, information and encouragement to empower individuals to make changes in their lives, giving them an opportunity to reconnect with their surrounding community.*

### Center Hours:

Monday:        8 a.m. - 4:30 p.m.
Tuesday:       8 a.m. - 4:30 p.m.
Wednesday: 8 a.m. - 12:00 noon
Thursday:     8 a.m. - 4:30 p.m.
Friday:         8 a.m. - 4:30 p.m.

All services provided are <u>free of charge.</u>
Se Habla Español

## PRIMARY PROGRAM SERVICES

- Emergency Services
- Food (Bread and Roses Café)
- Shower
- Laundry
- Phone and phone messages
- Mail
- Clothing
- Support groups
- Case management
- Mental health counseling and referrals
- Shelter, transitional housing and
- Permanent housing referrals
- Drug and Alcohol program referrals
- Medical and Dental services referrals
- Domestic Violence Interventions
- Assistance with benefits (SSI/GR) programs

## HOW TO QUALIFY

- If you are homeless or at risk of becoming homeless, you qualify for our services

## ADDITIONAL INFORMATION

The Outreach Team reaches out to homeless individuals in an attempt to encourage them to utilize services at St. Joseph Center as well as in the Community. This program is funded by LAHSA (Los Angeles Housing Service Authority) and works in collaboration with Venice Family Clinic and the St. Joseph Center Mental Health Specialist.

Homeless Service Center
404 Lincoln Blvd
Venice, CA 90291
Phone: 310 399 6878 x4#
Fax:  310 399 1339
www.stjosephctr.org





# Dockweiler RV Park Rules and Regulations

Rules and regulations are provided to protect Dockweiler RV Park patrons for the enjoyment, convenience, health and safety of guests. The rules should be observed in the spirit of consideration for others. Campers/guests who fail to obey the Rules and Regulations may be requested to leave. (Pursuant to California Civil Code Section 799.20, et seq.)

1. Length of stay: Up to 21 day stay in a 60-day period, which begins on date of first arrival and maximum of 60 days per calendar year. This applies to owner/operator of the RV/camper/trailer, all occupants and the RV/camper/trailer itself.
2. Check-in 1:00 p.m. to 9:00 p.m./check-out 12:00 Noon. Early check-in available at $17.00 rate. DMV registration may be requested at check-in. Visitors must vacate the RV Park by removing all RV's, camping vehicles, trailers, passenger vehicles and personal property before Noon on the ending date of the permit.
3. Fees must be paid in advance upon registration. No more than 5 spaces per person can be reserved at one time.
4. Any changes to reservations and/or cancellations must be given 7 days prior to scheduled arrival date. Failure to give at least 7 days notice for a change of arrival date will result in the loss of the entire reservation. Cancellation fee: 1st days fee if not cancelled at least 7 days prior to arrival date. No-shows will also incur a 1st days fee. NO EXCEPTIONS.
5. Changes are not permitted to reservations that include holiday weekends, which include MEMORIAL DAY, 4th of JULY and LABOR DAY. The weekends include Fridays. Changes are also not permitted for reservations that are 10 days or longer. If you need to make changes to your reservation, the entire reservation will be cancelled and you will not be permitted to make a new reservation that includes any of the cancelled dates. The rule applies to the customer making the reservation and the RV.
6. Departure date ticket must be affixed to windshield of vehicles at all times. All extra and guest vehicles must be registered with the office prior to entering the park. RV Park patrons must make sure that their visitors leave no later than 10:00 p.m. DO NOT ISSUE THE CODE NUMBER TO ANYONE. Vehicles not displaying a proper parking permit issued by the RV Park office may receive a parking violation.
7. Vehicles must be self-contained and carry the RV industries approval registry number and manufacture's label.
8. RV's, camping vehicles and trailers must remain on wheels at all times. Size limit is 37 feet. NO EXCEPTIONS.
9. RV's, camping vehicles and trailers must be parked head in/or head out only. No sideways parking.
10. RV's being towed by a tow truck are not permitted in the park, unless the tow truck is registered to the owner of the RV and it's the mode of movement for the trailer.
11. Vehicles must park behind designated white line. Parking over the line may result in a parking citation.
12. MOTORCYCLES-up to two complimentary motorcycles per site. All motorcycle(s) must be registered in the RV Park office. Up to 5 motorcycles may be parked in a site, provided they fit. If they don't fit, they can be parked against the wall (Monday through Thursday). Friday, Saturday, Sunday or Holidays, they may be parked in lot #1 (payment to park in lot #1 is made at the kiosk).
13. Requests for refunds must be made in person before leaving the Park or in writing within 15 days of departure.
14. Waste/sewage, water or effluent from sinks, portable toilets or other plumbing fixtures must be deposited in dumping facility only and may not be deposited directly on any pavement, dirt or vegetation.
15. The speed limit is 5 m.p.h.
16. Mopeds and bicycles are prohibited in the Park. Please use the adjacent bike path for bicycles.
17. Proof of rabies inoculation and a valid license are required for all dogs. (53.24 LAMC) Aggressive dogs will be removed and banned from the Park.
18. Pets must be contained or restrained on a leash of less than 6 feet at all times. (53.06.2 LAMC) Pets may not be left unattended outdoors at any time. (53.34 LAMC) Continuous barking is not permitted.
19. All animals are prohibited on the beach. (53.55 (a) LAMC)
20. Droppings and accidental waste material from pets must be picked up immediately and removed to trash dumpster. Limit two (2) pets per site. Please use provided dog runs.
21. A maximum of eight (8) persons allowed per RV/camping site.
22. Registered guests and all other users of this property are liable for all property damages.
23. Quiet hours are 9:00 p.m. to 6:00 a.m. daily. (Generators may be operated only between the hours of 8:00 a.m. and 8:00 p.m.) Please ensure that speakers, radios, televisions, etc. or other machinery do not emit sound beyond your space. (41.57A(1) LAMC)
24. Rowdiness, loud music, abusive language, drunkenness and possession or use of drugs will not be tolerated at any time.
25. Guests must keep their sites clean and free from clutter at all times.
26. No vehicle repairs, maintenance activities, fluid changes, washing/rinsing of vehicles/RV's are permitted in the park.
27. Rope, wire or string may not be attached to trees, vegetation, poles or County property at any time.
28. All property must be in the confines of assigned space. Parking on access road prohibited.
29. All tents/shades/awnings must have 3 open sides. (63.441(9) LAMC) No overnight outdoor sleeping is permitted.
30. Let coals extinguish themselves in barbeque. Do not remove.
31. Fires must be contained in covered fire pits only. Do not use the BBQ's for open fires.
32. The consumption of alcoholic beverages is not allowed on the beach.
33. Absolutely no firearms, fireworks, explosives or weapons of any kind are permitted within any RV, vehicle of any kind or on the person of any guest. (12031 (a) PC)
34. Youths under 18 years of age must be accompanied by a parent or guardian.
35. All federal, state and local laws must be obeyed at all times, this includes the RV and vehicles having current registration.
36. All signs, posted notices and directions of the RV Park manager must be obeyed. Non-compliance may result in immediate loss of parking privileges.
37. The County of Los Angeles and the RV Park management assume no responsibility or liability for the safety and security of campers/visitors and their personal property.
38. Management reserves the right to make changes deemed necessary in these regulations. We reserve the right to refuse services to current and returning guests that have violated our rules and regulations and/or have vacated the park without paying all fees.

*Occupants and their vehicles may be removed without a judicial hearing by law enforcement officers upon 72 hour written notice for failure to pay full amount of space rental when due or for failure to comply with the written rules and regulations of the park. Responsible law enforcement agency: Los Angeles Police Department Pacific Division, Tel. No: (310) 202-4502*






EXHIBIT 1 - PAGE 47




## *RV Parks*

THE DOCKWEILER RV PARK STAFF PROVIDES THIS LIST AS A COURTESY. FOR ADDITIONAL
INFORMATION PLEASE CONTACT THE INDIVIDUAL PARK.

**Anaheim Resort RV Park**
200 W. Midway Dr.
Anaheim, CA. 92805
(714)774-3860
Dump Station: $10

**Camp Williams**
24210 E. Fork Rd.
Azusa, CA. 91702
(626)910-1126

**Castaic Lake RV Park**
31540 Ridge Route Rd.
Castaic, CA. 91384
(661)2573340
Dump Station: $10

**Newport Dunes Waterfront Resort**
1131 Back Bay Dr.
Newport Beach, CA. 92660
(800)765-7661

**Golden Shore RV Resort**
101 Golden Shore
Long Beach, CA. 90802
(800)668-3581

**Anaheim Harbor RV Park**
1009 S. Harbor Blvd.
Anaheim, CA. 92805
(714)535-6495

**Anaheim RV Village**
333 W. Ball RD.
Anaheim, CA. 92805
(714)991-0100
Dump Station: $10

**Bolsa Chica Beach**
17851 Pacific Coast Hwy
Huntington Beach, CA. 92649
(800)444-7275

**Malibu Beach RV Park**
25801 Pacific Coast Hwy.
Malibu Beach, CA. 90265
310-456-6052

**Orangeland**
1600 W. Struck Ave.
Orange, CA. 92867
(714)633-0414
Dump Station: $10

**Huntington by the Sea**
21871 Newland St.
Huntington Beach, CA. 92646
(714)536-8316

**C. C. Campground**
12262 Harbor Blvd.
Garden Grove, CA. 92840
(714)750-6747
Dump Station: $15

**Valencia Travel Village**
27946 Henry Mayo Dr.
Castaic, CA. 91384
(661)257-3333

**California RV Resort**
1535 Sierra Hwy.
Acton, CA. 93510
(661)269-0914

**Point Mugu State Park**
9000 W. Pacific Coast Hwy.
Malibu, CA. 90265
(805)488-5223

**Dana Point RV Park**
25300 Dana Point Harbor
Dana Point, CA. 92629
(800)444-7275

**Sunset Vista**
103 Pacific Coast Hwy.
Huntington Beach, CA. 92648
(714)969-5621

EXHIBIT 1 – PAGE   48

# PARK FEES

|         | Year-round |
|---------|------------|
| FRONT   | $65        |
| MIDDLE  | $60        |
| BACK    | $55        |

HOLIDAY ADDITIONAL FEE $4
(Fee applies to the holiday, 3 days prior to the holiday
and 3 days after the holiday. A minimum 3 day reservation
is required during that 7 day holiday period. HOLIDAYS INCLUDED ARE
MEMEORIAL DAY, 4TH OF JULY AND LABOR DAY)

NOTE: THE ONLY CHANGES PERMITTED TO
RESERVATIONS THAT INCLUDE THE HOLIDAYS
STATED ABOVE ARE: ADDING DAYS AND
CHANGING SITES IF MADE AT LEAST 7 DAYS PRIOR
TO THE ARRIVAL DATE.

NO REFUNDS WILL BE ISSUED FOR RESERVATIONS
THAT INCLUDE THE SUMMER HOLIDAYS ABOVE, EVEN IF CANCELLED
7 DAYS IN ADVANCE. ALSO, NO REFUNDS WILL
BE ISSUED FOR CHECKING OUT EARLY ONCE YOU HAVE REGISTERED IN THE
SITE.

PLEASE ONLY RESERVE THE DATES THAT YOU NEED
AND REGISTER ONLY FOR THE DATES THAT YOU CAN
ACTUALLY STAY TO AVOID PAYING ANY UNNECESSARY FEES.

| | |
|---|---|
| PETS (MAX 2/SITE) | $3 |
| MORE THAN 4 GUESTS | $3 |
| (MAX IS 8 GUESTS/SITE) | |
| RESERVATION | |
| FEE | $10+1ST NIGHT'S DEPOSIT |
| DUMP | $10 |

REMEMBER
- Reservations must be made at least 7 days in advance and a maximum of 90 days from the arrival date.
- Permits are required for each space, including registration of extra vehicles.
- **MAX 8 PERSONS PER SITE.**
- RV limit is 37 feet.
- **NO TENT CAMPING.**
- Check in at 1 pm/Check out at 12 noon.
- Cancellation fee: 1st day's fee if not cancelled at least 7 days from arrival date.
- **NO VISITOR OR GUEST PARKING·**

EXHIBIT 1 – PAGE   49

# RANDY YOSHIOKA – Oakwood-Venice Task Force (OVTF)

| | |
|---|---|
| **From:** | BRENDA CRUMP |
| **To:** | Command;  Detective III's;  Detectives;  Lieutenants;  Pac SLO's; ·Pacif... |
| **Date:** | 10/13/2010 10:49 AM |
| **Subject:** | Oakwood-Venice Task Force (OVTF) |
| **Attachments:** | Oakwood-Venice TF Operations Plan.doc |

Goodmorning Pacific Team:

We had the official kick-off of our newly formed Oakwood-Venice Task Force, which started DP 11.  Our goal is the reduction in Part 1 crimes in Basic Car A11 and A13.  There has been a significant increase Year to Date especially in BFMV and GTAs in those areas.  Through the identification of criminal behavior, arrests, debriefs, follow-up searches, outreach, and community enhancement, I know we will be successful.

I have attached our mission and operations plan for your review.  It is important to note that <u>communication</u> between patrol, detectives, other Pacific specialized units, and outside entities will be the key to our success.  It is about our entire **Pacific Team!**

As a result of the work all of you have been doing in the last month we have already seen a very positive change.  Captain Peters and I appreciate your focus, commitment, professionalism, and positive attitude.

<u>**You are making an incredible difference in others' lives!!!**</u>

Thank you very much,


Brenda


Captain Brenda S. Crump
Commanding Officer
Pacific Patrol Division
(310) 482-6310
Fax: (310) 482-6339
MS 416



# Operations Plan
## Oakwood/Venice Task Force
### September 2010

Purpose: This Operations Plan is intended to provide an overview of the mission and subsequent operations for the Oakwood / Venice Task Force. This plan is confidential and shall not be distributed without the consent of the Commanding Officer, Pacific Area.

## I. SITUATION:

Pacific Area has seen a significant increase in Part I crimes in both the Venice Beach and Oakwood areas of the division; specifically basic cars 14A11 and 14A13. The majority of these crimes appear to be theft related, such as Burglary From Motor Vehicles and Grand Theft Auto. However, there have also been Aggravated Assaults and Robberies occurring on a continual basis. The majority of these crimes take place during evening or early morning hours.

Due to the amount of documented criminal activity, in addition to citizen complaints regarding criminal activity, illegal lodging, illegal dumping, trespassing, prostitution, narcotics sales, noise, and general "Quality of Life" issues, Pacific Area will deploy officers as part of a Task Force in these designated areas.

The boundaries for the Task Force have been defined as Lincoln Boulevard to the east, Washington Boulevard to the south (including the marina peninsula), the Pacific Ocean to the west, and Dewey Street to the north.

## II. MISSION:

The mission of the Task Force is to effect arrests of individuals who are violating local and state codes. In addition, officers will attempt to gain intelligence regarding individuals or groups who may be involved in criminal activity. Furthermore, officers will provide shelter and service provider information to individuals, whether arrested or not, with whom they come in contact with, or who are found to be violating the law by lodging in their vehicles, or who are found trespassing on city or private property during overnight hours, and who are deemed by the officer to be at risk or as someone who could benefit from the information.

The officers assigned to this Task Force will adhere to the "Four C's" philosophy:

- Commander's Intent
- Constitutional Policing
- Community Perspective
- Compassion

CONFIDENTIAL.

220

꿋·꿋
EXHIBIT 1 — PAGE 51

### III.   EXECUTION:

(Deployment)

The Task Force will be broken down into (4) unique groups:

- Venice Task Force Detail
- Beach Detail
- Bicycle Detail
- Special Operations Detail

### Venice Task Force Detail (VTFD) - Watch 2 - 0500 Hours  (7-Day Coverage)

The VTFD will identify those individuals who choose to illegally lodge in their vehicles, maintain unsafe or hazardous vehicles, and illegally trespass on private or city property.  Officers may also effect arrests of individuals whom they determine have violated state or local law.

In addition, the officers will provide shelter and service provider information to individuals, whether arrested or not, that they come in contact with and have deemed to be at risk, or someone whom the officer feels would benefit from the information.  The officers will also work with counselors from local service agencies, as well as members of the Clergy Council, to assist individuals with obtaining shelter and service provider information.

### Beach Detail - Watch 4 - 1030 Hours and Watch 5 - 1500 Hours  (7-Day Coverage)

The beach patrol will enforce state and local codes related to the Venice Beach area.  The officers will monitor the vendors, special events in the park, large crowds that visit the area on a daily basis, and heavy vehicular traffic associated with such activity.  In addition, the beach officers, throughout their shift, will extend their patrol duties east of Pacific Avenue into the areas where illegal activity has been identified as occurring.

### Special Operations Detail – Watch 5 – 1500 Hours (6-Day Coverage)

The Special Operation Detail will be responsible for conducting surveillance to gather intelligence in known areas where criminal activity is occurring.  In addition, this unit will coordinate details such as Bait Car, Bait Bike, and Buy/Bust.  They will also work with the Pacific Area Crime Intelligence Team to identify individuals who are on parole and/or probation and who are living within the defined area.  The unit will then schedule parole/probation searches at identified locations.

### Bicycle Detail – Watch 5 – 1600 Hours (6-Day Coverage)

The bicycle unit will be responsible for crime suppression in the defined areas.  They will patrol on bicycles and enforce state and local codes.  In addition, they will support the Special Operations Detail, as well as any other entities such as Vice or Narcotics, when a uniform officer element is required.

CONFIDENTIAL

221

EXHIBIT 1 – PAGE  52

<u>Senior Lead Officers -- Various Hours/Days</u>

The Senior Lead Officers (SLO's) will be responsible for keeping an open line of communication with community members and groups, as well as service providers, as it pertains to this Task Force. In addition, the SLO's will be tasked with ensuring that "Enhancement Requests" (graffiti removal, street lighting, garbage disposal, abandoned vehicles/shopping cart removal, etc...) are being directed to the appropriate entity and that the work is being completed in a timely manner.

(Support Elements)

The Task Force will also work in conjunction with the following entities to monitor criminal activity within the defined area:

- Pacific Area Narcotics Enforcement Detail
- Pacific Area Vice Detail
- Pacific Area Crime Intelligence Team
- Pacific Area Street Crimes Unit
- Pacific Area Gang Enforcement Detail
- Oakwood Task Force (Existing Footbeat)
- Los Angeles Police Gang and Narcotics Division
- City of Los Angeles Department of Transportation -- Parking enforcement
- Los Angeles County Probation Department
- California Department of Corrections and Rehabilitation (State Parole)
- Los Angeles County Department of Children and Family Services Multi-Agency Response Team (MART)

## IV.  ADMINISTRATION:

(Arrest Reports / Related Reports / Follow-Up)

The Task Force will have detective support in their daily operations. The detectives will have the following responsibilities:

- Review all arrests from the previous day to identify criminal patterns or behavior, repeat offenders, connection to other criminal activity, and to ensure reports are being written in an organized and detailed manner
- Assist with debriefs of arrestees
- Provide advice for booking charges
- Provide on-scene detective support at crime scenes or during immediate follow-up situations
- Ensure assigned detectives are properly filing cases and requesting Stay-Away Orders when appropriate and necessary
- Liaison with Pacific Area's Neighborhood Prosecutor to ensure that cases are being filed and Stay-Away Orders are issued when appropriate and necessary
- Provide "Real-Time" criminal and/or administrative information to the Officer in Charge of the Task Force, who will then immediately disseminate the information to the officers and other support elements

CONFIDENTIAL

222

EXHIBIT 1 -- 3-4 PAGE   53

- Review the criminal history of all arrestees, regardless of the charge, to determine if there is a pattern of criminal activity that is related to the crimes that have been identified in the defined area
- Liaison with Watch Commanders and Detention Officers to ascertain if the Drop-and-Go program is being utilized to its fullest extent.

## V.  CONCLUSION:

The ultimate measure of the task force's effectiveness will be multi-pronged. First, there must be a significant reduction in Part I Crimes. Daily analysis; accurate, timely intelligence; honest discourse with stakeholders; and a flexible workforce that can rapidly respond to burgeoning trends will be the hallmarks of the taskforce. Second, the task force will seek to increase the utilization of pre-existing service providers. Job training, substance abuse counseling, alternate lodging, and medical care are critical to the prolonged success of these efforts. Finally, there must be a heightened perception of safety amongst those who reside in and visit Venice. Our Department mission is clear: to prevent the fear and incidence of crime. The task force successes must be shared with the Venice community members via a consistent, transparent media campaign. The increased presence of officers in Venice - on bike, on foot, and in cars - will provide daily opportunities for task force officers to forge meaningful alliances, increase trust, and reduce fear of crime.

CONFIDENTIAL

223

EXHIBIT 1 – PAGE   54

1                          REPORTER'S CERTIFICATE

2

3            I, Jennifer J. Angelov, CSR No. 12287, a

4     Certified Shorthand Reporter in and for the State of

5     California, do hereby certify:

6            That prior to being examined, the witness named

7     in the foregoing proceedings declared under penalty of

8     perjury to testify to the truth, the whole truth,

9     and nothing but the truth;

10           That said proceedings were taken by me in

11    shorthand at the time and place herein named and were

12    thereafter transcribed into typewriting under my

13    direction, said transcript being a true and correct

14    transcription of my shorthand notes;

15           Pursuant to Federal Rule 30(e), transcript

16    review was requested;

17           I further certify that I have no interest in

18    the outcome of this action.

19                          September 6, 2011

20

21

22                          _____

23                          Jennifer J. Angelov
                            CSR No. 12287

24

25

ORIGINAL

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CHEYENNE DESERTRAIN, STEVE )
JACOBS-ELSTEIN, )
BRADFORD/ECKHART, PATRICIA )
WARIVONCHIK, LEROY BUTLER, )
WILLIAM CAGLE, TERRY )
HENDRICKSON, )
)
           PLAINTIFFS, )
)
   V. )     NO. CV10-09053 RJK (PJWx)
)
CITY OF LOS ANGELES, A )
MUNICIPAL ENTITY, DOES 1-10, AS )
INDIVIDUALS, )
)
          DEFENDANTS. )
)

# DEPOSITION OF CHEYENNE DESERT RAIN

# AUGUST 9, 2011

REPORTED BY:
PAMELA S. HARRIS
CSR. NO. 3909
JOB NO. 11AE593-PH



COURT REPORTERS
515 S. Flower Street
Suite 3600
Los Angeles, California 90071
Office: (213) 955-0070
Fax: (213) 955-0077

EXHIBIT 2 — PAGE 56

1    not being able to park a RV at the Rose Avenue

2    parking lot?

3         A.      You could say that.

4         Q.      Okay.  When, if you recall, were you no

5    longer allowed to park a RV at the Rose Avenue

6    parking lot?

7         A.      I'll say October.

8         Q.      October of 2010?

9         A.      Yes.

10        Q.      Okay.  On how many occasions before

11   October of 2010 during that same year did you park

12   your RV at that location?

13        A.      Every day.

14        Q.      Okay.  Now, is there a particular

15   reason why you would use that lot as opposed to

16   another parking lot in the Venice area?

17        A.      Because that is where I do my art.

18   That is where I have friend, my friend is.  That is

19   where closer to the market.  That's where everything

20   that I do is there.

21        Q.      You own a recreational vehicle;

22   correct?

23        A.      Yes.

24        Q.      Okay.  For what period of time have you

25   owned the vehicle?

1     A.     Three or four year.  I'm not certain.

2     Q.     Three or four years?

3     A.     Yes.

4     Q.     Okay.  Is that the vehicle that you

5  referred to that you would travel from Reseda to

6  Venice Beach in?

7     A.     No.

8     Q.     Okay.  How would you travel to -- or

9  how did you travel from Reseda to the Venice Beach

10  area during --

11     A.     I ride with my friend sometime.

12  Sometime --

13     Q.     Hold on.  Let me just finish my

14  question so it's little clear.

15            I'm focusing on the period of August

16  1st to December 31st of last year.  So during that

17  period of time, how would you get from Reseda to

18  Venice Beach?

19     A.     I would ride with my friend half the

20  time.  And when I want to be by myself, I drive my

21  car.

22     Q.     And can you describe that car for us.

23     A.     '87 Mercedes 300.

24     Q.     Have you provided your counsel with any

25  pictures of that vehicle in relation to this

1    photograph in relation to one of the citations we're

2    here to discuss?

3         A.       Yes.

4         Q.       Okay.  Do you recall if it was after

5    the first or the second citation that you took this

6    photograph?

7         A.       That's the first citation.

8         Q.       Okay.  Thank you.

9                  It's my understanding that the first

10   citation, I believe, was issued on September 13; is

11   that correct?

12        A.       Maybe so.  I don't -- like I said, it's

13   a document.  I can't remember.

14        Q.       Okay.  I'm going to show this to you.

15   It looks like it was issued on 9/13/10.  It's a

16   pretty good color copy, but the number of the month

17   is a little difficult to read.  Tell me if you

18   recognize that.

19                 (Deponent examined a document.)

20        MS. MILLMANN:  Does this have a Bates stamp?

21        MS. PESSIS:  It does.  I'm just going to see if

22   she recognizes it first and then I will mark it.

23        THE DEPONENT:  Right.  I recognize it.

24        MS. PESSIS:  Okay.  This is No. 32.  And we'll

25   mark this as Exhibit No. 4.

EXHIBIT 2 - PAGE  59

33
Cheyenne Desert Rain    August 9, 2011

```
 1              (Defendants' Exhibit 4 was
 2         marked for identification by the
 3         reporter, a copy of which is
 4         attached hereto.)
 5   BY MS. PESSIS:
 6        Q.      Were you present when this citation was
 7   issued?
 8        A.      I was not.
 9        Q.      Do you know if anyone, meaning a member
10   of the public, was present when this citation was
11   issued by the City's employees?
12        A.      I was not.
13        Q.      You don't know?
14        A.      I don't know.
15        Q.      Okay.  Has anyone ever told you that he
16   or she saw officers or transportation employees
17   issuing citations that day on that street, Hampton?
18        A.      I don't recall.
19        Q.      Okay.  Do you recall at what time you
20   parked your vehicle in this location as depicted in
21   Exhibit 3 that day?
22        A.      7:00 in the evening.
23        Q.      7:00 in the evening.
24              Do you recall approximately when you
25   returned to the vehicle?
```

1        A.        Like 6:30 in the morning.

2        Q.        Okay.  Do you recall seeing the

3    citation as soon as you got to the vehicle?

4        A.        Yes.

5        Q.        Okay.  Where do you recall the citation

6    being located in relation to your vehicle?

7        A.        In the front by the driver -- in front

8    of the driver's side of the RV.

9        Q.        Okay.  Was it attached to the front

10   windshield?

11       A.        Yes.

12       Q.        Okay.  And so you read the citation, I

13   take it?

14       A.        Yes.

15       Q.        Okay.  Did you understand, at that

16   point in time, why you had been cited, according to

17   what was written on the citation?

18       A.        I do not because I was not where she

19   said I was.

20       Q.        Okay.  So why don't you tell me what

21   you're talking about.

22       A.        Okay.

23       Q.        Here you go.  And the witness is --

24       A.        These do not have anything to do where

25   my RV is (indicating).  I'm 44 feet -- 44 feet from

EXHIBIT 2 - PAGE  61

1  the sign post say, "No vehicle over six feet," which

2  point from here toward Sunset (indicating).  I was

3  44 feet from there to the north side.  So I was 44

4  feet from the sign that post, "No vehicle over six

5  feet," the -- the arrow point that way (indicating).

6       Q.      Okay.  I'm not sure I follow you.

7               So your vehicle here -- because I don't

8  know the area like you do --

9       A.      Okay.

10      Q.       -- okay? -- I've only been there a

11 couple times.

12      A.      Okay.

13      Q.      Are you facing south --

14      A.      Yes.

15      Q.      -- here in this picture?

16      A.      Yes.

17      Q.      Okay.  All right.  So you're facing

18 south.  Okay.

19              Now, you're saying there's a sign

20 there?

21      A.      See the pole right here (indicating).

22      Q.      I do.

23      A.      The sign post here say "No vehicle over

24 6 feet" where the arrow point that way, toward

25 Sunset (indicating).

EXHIBIT 2 - PAGE  62

1      Q.      Okay.  So the sign was facing the
2  opposite direction --
3      A.      Right.  Yes.
4      Q.      -- is what you're saying.
5              So when you pulled up into this parking
6  space, I take it it's your testimony that you could
7  not read the sign because it was facing the opposite
8  direction?
9      A.      I can read.  That's why I didn't park
10  there.
11      Q.      No, no.  I'm saying you weren't able to
12  read the sign, is that what you're saying?
13      MS. SOBEL:  No.  That misstates her testimony.
14      MS. PESSIS:  Okay.  Well, I'm not trying to.  I
15  don't -- I just -- it's hard to see in the picture.
16  I'm having a hard time with the picture but --
17      MS. SOBEL:  Well, we can have the court
18  reporter read it back.  Because what she said was
19  the arrow pointed in the other direction --
20      MS. PESSIS:  Okay.
21      MS. SOBEL:  -- so where she parked was within
22  the permitted area.
23      MS. PESSIS:  Okay.
24      Q.      So you're saying -- it's your testimony
25  that the arrow on the sign was pointing to which

1  direction?

2       A.      South.

3       Q.      Okay.

4       A.      For Sunset.  100 feet from Sunset to

5  that pole.  I -- okay.  Here's the pole

6  (indicating).  The sign say, "No vehicle over six

7  feet."  The arrow point that way (indicating) on the

8  corner of Sunset.

9       Q.      Okay.

10       MS. MILLMANN:   "That way" being south?

11       MS. PESSIS:  Right.

12       THE DEPONENT:   South.  I was parked north of

13  the pole, which is 44 feet from the pole.

14  BY MS. PESSIS:

15       Q.      Okay.  And then you're -- I guess what

16  you're saying is that there was more than 100 feet

17  from the pole to the corner as well?

18       A.      It's 200 feet.  Actually, from the --

19  from the where I park toward the street of Sunset is

20  275 feet.

21       Q.      Okay.  How do you know that?

22       A.      I measured it.

23       Q.      Okay.  How did you do so?

24       A.      With the measuring tape.

25       Q.      Okay.  Did anyone assist you in doing

1   13th, did anyone accompany you at that time?

2       A.      I was in my car.  No.

3       Q.      Okay.  When you discovered the

4   citation, was anyone with you at that time?

5       A.      No.

6       Q.      Okay.  Is it your testimony that your

7   vehicle, on September 13, 2010, had a disability

8   license plate affixed to the front of the vehicle?

9       A.      Front and the back.

10      Q.      Okay.  Well, I was going to ask a

11  separate question, but you've answered it.

12              Okay.  I'd like to talk to you about an

13  incident which I have been made aware of.  It

14  occurred on October 16, 2010.  Do you recall that

15  date and some issue with some LAPD officers?

16      A.      Not exact date, no.

17      Q.      Okay.  Do you recall an incident where

18  you were inside your RV and you heard some type of

19  loud noise or thump outside?

20      A.      Yes.

21      Q.      Okay.  On that occasion, I believe you

22  encountered two LAPD officers; is that correct?

23      A.      Yes.

24      Q.      Are those officers here today seated

25  behind me?

EXHIBIT 2 - PAGE   65

1       A.      No.

2       Q.      Do you know their names?

3       A.      No.

4       Q.      Are you able to describe them?

5       A.      It was dark.  I only saw uniform.  They

6    don't have no light on.

7       Q.      Were these officers in a patrol car or

8    were they on bicycles?

9       A.      Bicycles.

10       Q.      Now, prior to this occasion, which I

11    understand was during October of 2010, had you ever

12    seen these two officers before?

13       A.      No.

14       Q.      Okay.  Do you need any water?  We've

15    been going for a little bit.  Or do you need a

16    break?

17    MS. SOBEL:  Why don't we take a five-minute

18    break.

19    MS. PESSIS:  Want to take quick break?  Okay.

20            (Brief recess taken.)

21    BY MS. PESSIS:

22       Q.      All right.  Let me ask you, along the

23    lines of this incident where you heard a loud noise,

24    at the time, did you have an understanding of what

25    that noise was?

EXHIBIT 2 - PAGE  66

1        A.        Yes.

2        Q.        Okay.  What was it?

3        A.        It was the kick noise on my RV on -- on

4    the street side.

5        Q.        Okay.  So you were in your RV at the

6    time parked on a street in Venice?

7        A.        Yes.

8        Q.        Okay.  Where were you parked at that

9    time?

10        A.        On Hampton Drive.

11        Q.        All right.  So you were on Hampton.

12    And were you facing north or south; do you recall?

13        A.        Okay.  I park on west side on Hampton

14    facing Sunset.

15        Q.        So you were facing --

16        A.        Facing --

17        Q.        Were you facing south?

18        A.        -- south.

19        Q.        Okay.  Do you recall at approximately

20    what time you heard this kicking sound or noise that

21    you've described?

22        A.        Between like -- between 7:00 or 7:30.

23        Q.        In the evening?

24        A.        Yes.

25        Q.        Okay.  Was anyone with you at the time?

EXHIBIT 2 - PAGE  67

1       A.      No.

2       Q.      Okay.  What were you doing at the time

3   that you heard this loud noise?

4       A.      I was just putting my dog up, and I was

5   standing.  All my window is open in back my RV, the

6   window is open.

7       Q.      There is a window in the back of the

8   RV?

9       A.      Yes.

10      Q.      Okay.  Are there windows that open on

11  the sides of the RV?

12      A.      Window?  No.  I have lot of stuff

13  there; so that window does not open.  It

14  partially -- was just partially -- the window in the

15  back on the side sometime will be partly open.

16  Sometime will close because of my -- I don't want

17  people to scare my dog.

18      Q.      Okay.

19      A.      So that's where my dog is so -- but the

20  back window is always open.  Never closed.

21      Q.      So let me ask you this:  For what

22  period of time had you been parked in this

23  particular location before you heard this kicking

24  sound?

25      A.      Every other day.  I'm -- you know, I'm

 1   not sure how often but --

 2       Q.      How long --

 3       A.      -- at night, actually.

 4       Q.      Oh, I'm sorry.  I didn't mean to

 5   interrupt you.

 6               I'm trying to find out how long you had

 7   been parked on that particular occasion before you

 8   heard the noise.

 9       A.      That day?

10       Q.      That day, yes.

11       A.      I left the beach --

12       MS. SOBEL:  I'm going to -- okay.  You can

13   answer.

14       THE DEPONENT:  I left the beach at

15   approximately 6:00 and parked there, walk my dog.

16   And we walk and I brought my dog back, get my stuff,

17   get in my car.

18   BY MS. PESSIS:

19       Q.      How long did it take you to walk the

20   dog that evening, do you think?

21       A.      20, 30 minutes.

22       Q.      Where were you parked at the beach when

23   you left at about 6:00 that evening?

24       A.      Rose parking lot.

25       Q.      Okay.  Is that the parking lot we

Cheyenne Desert Rain    August 9, 2011

```
 1    or try to look outside a window?
 2         A.      I already know who it was.
 3         Q.      You knew who it was?
 4         A.      Yes.
 5         Q.      Meaning you saw that it was police
 6    officers?
 7         A.      Yes.
 8         Q.      Okay.  But you did not recognize them?
 9         A.      It was dark.
10         Q.      Okay.  So --
11         MS. SOBEL:  I'm going to object.  I think you
12    misstated her testimony.  She's already testimony
13    she looked out the window.  She was standing by the
14    window.
15         MS. PESSIS:  Okay.  Well, I was a little
16    confused because I wasn't sure which side of the RV
17    she was talking about.
18         Q.      Okay.  So you looked outside a window?
19         A.      Yes.
20         Q.      Okay.  Is it this window (indicating)?
21         A.      No.
22         Q.      Okay.  Can you show me the window.
23         A.      It's the back window, which is not
24    shown on the picture.
25         Q.      Okay.
```

1       A.      It was shown on the picture where I
2   took the place of the license plates.
3       Q.      Okay.  I'm going to ask you to do
4   something that some people have a hard time with; so
5   do your best.
6               What did the officers look like?  Let
7   me ask you this:  male and female?  Males?  Females?
8       A.      Females.  I believe females.
9       Q.      More than one officer?
10      A.      Two.
11      Q.      Two officers.  Were they both females
12  from what you can recall?
13      A.      Yes.
14      Q.      Okay.  Tell me what they looked like.
15      A.      I cannot recall because it was dark.
16      Q.      Okay.  I understand that, and I
17  appreciate that fact.
18              Are you able to describe their height
19  at all?
20      A.      Even though I know I have idea who it
21  is, but still it's not hundred percent sure so I'm
22  not going to say if I'm not hundred percent sure who
23  it is, even though  have idea who it is.
24      Q.      Okay.  Why do you have an idea of who
25  it is?

1        A.        I just have an idea.  I'm kind of --

2    you know, it's like -- it's like the way they look,

3    they way it seem, it seemed like the police that I

4    seen around.  But since I'm not have a clear

5    picture, what my idea, what my belief is, it's not

6    going to mean anything.  I'm not going to say it

7    until I have -- I know a hundred percent sure.

8        Q.        Okay.  Who do you think the officers

9    might have been?  I understand you're not a hundred

10   percent sure; so I'm not putting words in your

11   mouth.  But who do you think it could have been?

12       A.        Those two that gave me the first

13   ticket.

14       Q.        You think one of the officers was

15   Officer Quesada?

16       A.        Yes.

17       Q.        Okay.  Did you have an understanding,

18   at the time of the October incident, that she had a

19   partner with whom she worked?

20       A.        Yes.

21       Q.        Okay.  Do you know who that partner is,

22   as far as the name of this officer?

23       A.        I seen a partner.  I don't know the

24   name.

25       Q.        Okay.  So you would --

```
 1              Did you ever speak to either one of
 2  those officers during this incident?
 3       A.      No.
 4       Q.      Okay.  Did you hear either one of the
 5  officers say anything to the other officer?
 6       A.      No.
 7       Q.      Okay.  Did it appear to you that the
 8  officers were attempting to contact anyone who they
 9  thought may have been inside the RV at that time?
10       A.      No.
11       Q.      Okay.  You didn't hear them say
12  anything at all?
13       A.      No.
14       Q.      Okay.  And you heard a noise, which you
15  described as a kicking?
16       A.      Yes.
17       Q.      Okay.  How long did that go on for, do
18  you think?
19       A.      Just like a hit-and-run.
20       Q.      How long do you think the officers were
21  there within a close proximity to your RV on this
22  occasion?
23       A.      It's just drive-by.  They didn't stick
24  around.
25       Q.      Okay.  You were not cited on that
```

Cheyenne Desert Rain    August 9, 2011

```
 1    occasion; correct?
 2         A.      No.
```

 3         Q.      Okay.  Have you ever met Captain Jon
 4    Peters from the LAPD?
 5         A.      No.
 6         Q.      Okay.  Have you ever spoken to him over
 7    the telephone?
 8         A.      No.
 9         Q.      Okay.  I'd like to talk to you about an
10    incident where I believe you were pulled over around
11    October 28, 2010.  Does that sound familiar?
12         A.      Pulled over, no.  Follow, you mean
13    follow to the gas station?
14         Q.      Well, I don't know anything about
15    following.  I just know something about a stop for a
16    broken taillight incident.
17         A.      That's pulling into the gas station.  I
18    was followed in.  They didn't stop me.  I stopped
19    get gas.
20         Q.      Okay.  Where is that gas station
21    located?
22         A.      Rose Avenue and Lincoln Boulevard.
23         Q.      Do you know the name of the gas
24    station?
25         A.      Arco.

EXHIBIT 2 — PAGE  74

1           After the officers left, did you go

2    ahead and put gas in the car?

3           A.      Yes.

4           Q.      Okay.  Have you seen those officers

5    since that time?

6           A.      I have seen them, yes.

7           Q.      On how many occasions?

8           A.      Four or five.

9           Q.      Have you had any issues with them since

10   that time?

11          A.      No.

12          Q.      Let me ask you this:  When you were at

13   the gas station, was there any discussion with

14   either one of the officers about your disability

15   license plates?

16          A.      No.

17          Q.      No.

18                  Okay.  I'd like to talk to you about

19   this citation which you were issued on November 3,

20   2010.  I think this is No. 7.  I'm going to mark

21   this as Exhibit No. 7.  I'll show it to you in just

22   a moment.  This is Citation No. 1087397102, issued

23   by Officer Prince on November 3, 2010, looks like at

24   12:30 in the afternoon, and it's Bates numbered

25   Page 28.

1              Let me show this to you, Ms. Desert

2    Rain.  Do you recognize that document?

3                   (Defendants' Exhibit 7 was

4              marked for identification by the

5              reporter, a copy of which is

6              attached hereto.)

7                   (Deponent examined a document.)

8         THE DEPONENT:  Yes.

9    BY MS. PESSIS:

10        Q.     Were you present when that citation was

11   issued in relation to your vehicle?

12        A.        Present, I was, but after the citation

13   was done.

14        Q.        Okay.  So you weren't there when

15   Officer Prince wrote the citation, and I assume that

16   you found it on the vehicle?

17        A.        No.  I saw him as -- I mean.  Not him.

18   I saw their police car.  I saw him wrote the ticket,

19   and that's why I came around and asked him why he

20   wrote me a ticket.

21        Q.        Okay.  So you actually saw him issuing

22   the citation to your vehicle?

23        A.        When I saw him, I just saw him there by

24   the vehicle, he issued, you know, a ticket; but I

25   wasn't sure.  That's why I came around and pull up

1   beside him, and then that's when I saw that citation
2   was on the RV.
3        Q.      Okay.  Now, have you seen any pictures
4   here today which depict where your vehicle was
5   located when you received the citation?
6                You want to take a look at those.
7                The witness is looking through -- or
8   I've given her the stack of exhibits.
9                (Deponent examined various documents.)
10       THE DEPONENT:  No, this is not.  This is not.
11  BY MS. PESSIS:
12       Q.      No?  Okay.
13               Go ahead.  Take your time.  Just let me
14  know if there's something in there that helps you
15  explain to us where your vehicle was located.
16       A.      Not.
17       Q.      No?  From what you've seen so far.
18       A.      No.
19       MS. PESSIS:  Let's go off the record real
20  quick.
21       MS. SOBEL:  Uh-huh, yeah.
22               (Discussion held off the record.)
23       MS. PESSIS:  Okay.  So I've clarified with your
24  counsel that photographs of where your vehicle was
25  located on November 3, 2010 when it was issued the

1    citation have not been produced.
2        Q.      Okay.  So by reading the citation, it
3    appears to me that you were given this citation, at
4    which time your vehicle was parked on Hampton south
5    of Rose Avenue.
6        A.      Yes.
7        Q.      That is consistent with your
8    recollection?
9        A.      Yes.
10       Q.      Okay.  What is the next nearest
11   cross-street to Hampton and Rose, if you recall?
12       A.      Sunset and Rose.  Sunset and Rose.
13       Q.      Okay.  On which side of Hampton were
14   you parked?
15       A.      East.
16       Q.      On the east side of the street?
17       A.      Yes.
18       Q.      Okay.  And were you facing northbound
19   at the time?
20       A.      Facing north, yes.
21       Q.      Okay.  And then to the north would be
22   Rose Avenue; correct?
23       A.      Yes.
24       Q.      Okay.  And to the south --
25       A.      Sunset.

1      Q.      Okay.  When you parked the vehicle, was

2   anybody with you?

3      A.      No.

4      Q.      Okay.  You were driving your RV that

5   morning and not your other vehicle; correct?

6      A.      The RV was parked.  I was driving my

7   Mercedes.

8      Q.      Okay.  So the RV was parked, but you

9   are were using the Mercedes that day?

10      A.      Yes.

11      Q.      Okay.  So now, just so we're clear, the

12   RV had been parked there since about 10:00 in the

13   morning?

14      A.      Yes.

15      Q.      Okay.  And did you then leave the

16   location immediately after parking at approximately

17   10:00?

18      A.      Yes.

19      Q.      Okay.  Approximately when did you

20   return to this location, meaning where you were

21   cited?

22      A.      When I passing by from the beach,

23   passing by, that's when I saw the police car.

24   That's when I came around.

25      Q.      Is it your testimony that there are

EXHIBIT 2 - PAGE  79

86
Cheyenne Desert Rain    August 9, 2011

1   parking meters along the east side of Hampton along

2   where you were parked?

3        A.     It's not -- it's two hours limit

4   parking sign posted.

5        Q.     Okay.  So there are no parking meters

6   there, are there?

7        A.     No.

8        Q.     Okay.  Do you recall which day of the

9   week this was?  Was it a Monday?  A Tuesday?

10  Wednesday?  Other day?

11       A.     No.

12       Q.     When you parked at this location on

13  this date, meaning November 3, 2010, were you

14  familiar with the signs that were there that limited

15  parking for two hours?

16       A.     Yes.

17       Q.     Okay.  When you parked your vehicle at

18  this location, meaning the RV on November 3, 2010,

19  was it your understanding that because you have the

20  disabled license plates, you were exempt from the

21  two-hour parking rule?

22       A.     Yes.

23       Q.     Okay.  Is that something someone had

24  told you before November 3, 2010?

25       A.     No.

1       Q.       Okay.  And what did you say?

2       A.       I asked him why he was giving me a

3    citation.

4       Q.       Did he say anything to you?

5       A.       Yes.  He said because it's over two

6    hours, my RV was parked there over two hours, so

7    that's what he cite me for, for two hours, over two

8    hours parking.

9       Q.       Did you say anything to him in

10   response?

11      A.       Yes.  I said to him that I were exempt

12   from that.

13      Q.       What did he say, if anything, to you?

14      A.       In that particular time I don't recall

15   what he said, but the conver -- other conversation

16   is going that he told me that he was told to go out

17   and cite the RV with the problem, that he had told

18   the RV the day before for whatever the violation is

19   and that why -- he said that if somebody on the

20   street, if they don't want help and they need to

21   be -- and they go get -- how said that? -- put out,

22   get out of Venice and -- it was a lot of things

23   said.  I don't remember exact word to word, but,

24   yeah, it was a lot of communication is going on.

25      Q.       So you just said something about

Cheyenne Desert Rain    August 9, 2011

1    Officer Prince told you that he had been instructed

2    to issue your vehicle a citation?

3         A.      Not my vehicle.  Any vehicle.

4         Q.      Any vehicle.

5         A.      Any RV in particular.

6         Q.      Okay.  So tell me again what he said

7    about what he had been told to do, because it's a

8    little unclear to me.

9         A.      He was instruction by his superior to

10   go and clean up the street problem vehicle that park

11   on the street.

12        Q.      Did he tell you that he had received

13   any particular complaints about your vehicle?

14        A.      No.

15        Q.      Did he mention to you at that time the

16   name of any supervisors?

17        A.      No.

18        Q.      How would you describe his demeanor

19   during this conversation with him?

20        A.      He was calm and being professional.

21        Q.      Did he threaten you in any way?

22        A.      No.

23        Q.      Did he force you to do anything you

24   didn't want to do?

25        A.      No.

EXHIBIT 2 - PAGE  82

```
 1       Q.      But you told him you disagreed with the
 2   ticket; correct?
 3       A.      Yes.
 4       Q.      Did you ever challenge this ticket?
 5       A.      Yes.
 6       Q.      Okay.  And did you challenge the ticket
 7   with the assistance of an attorney?
 8       A.      No.
 9       Q.      Okay.  Did you challenge the ticket on
10   your own?
11       A.      Yes.
12       Q.      Okay.  Did Ms. Peggy Kennedy assist you
13   in challenging the ticket?
14       A.      She helped me with the paperwork, yes.
15       MS. PESSIS:  Okay.  I'm just going to mark here
16   as Exhibit 8.  This is Bates No. 50.
17       Q.      Do you recognize this, Ms. Desert Rain?
18               (Defendants' Exhibit 8 was
19            marked for identification by the
20            reporter, a copy of which is
21            attached hereto.)
22               (Deponent examined a document.)
23       THE DEPONENT:  This is could be handwriting --
24   this is -- sometime my handwriting, they not the
25   same so I -- a lot of time I don't even recognize my
```

1   own handwriting because they not the same.

2   BY MS. PESSIS:

3       Q.      Okay.  This appears to be some

4   handwritten notes, and it looks like it was signed

5   by Peggy Kennedy --

6       A.      Yes.

7       Q.      -- is that your understanding?

8       A.      Yes.

9       Q.      Okay.  And I'm just going to try to

10  read some of this into the record.  It looks like it

11  is dated the 20th of January, 2011.  It makes

12  reference to contacting Parking Violations Bureau

13  regarding 1087397102, which matches the number on

14  the ticket issued to you by Officer Prince.

15      A.      Yes.

16      Q.      And it references somebody by the name

17  of Darlene and something about sending paperwork and

18  there was a wrong address and then there's a P.O.

19  Box.

20              Were you present when Ms. Kennedy wrote

21  these notes?

22      A.      I don't recall.  She's -- if she did it

23  for me, I always have to be present.

24      Q.      Okay.  So you challenged this ticket;

25  correct? --

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | -- that Officer Prince wrote to you? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  Whatever happened with that? |
| 5 | A. | It's been dismissed. |

6    Q.     Okay.  And did you obtain from anyone

7  at the City or a court paperwork which discusses or

8  tells you why it was dismissed?

9    A.     I probably did.

10    Q.     Okay.  Do you still have that

11  paperwork?

12    A.     I think so, yeah.

13    Q.     Okay.  Let me ask you this:  Did you

14  read any of that paperwork after you obtained it?

15    A.     I already examined it.  I already know

16  the reason why they was dismissed so . . .

17    Q.     Well, that's my next question is:  So

18  why was it dismissed, if you know?

19    A.     Because the handicap plates.

20    MS. SOBEL:  Counsel, for the record, the courts

21  don't issue any paperwork if they dismiss.

22    MS. PESSIS:  Well, I have other paperwork here.

23    MS. SOBEL:  Because there was an appeal.  There

24  was an appeal.

25    MS. PESSIS:  Okay.

EXHIBIT 2 — PAGE  85

1       MS. SOBEL:  If it's dismissed at the -- if it's

2   dismissed at the initial hearing --

3       MS. PESSIS:  Right.  I see that.

4       MS. SOBEL:  -- they issue nothing.

5       MS. PESSIS:  Okay.  At the initial hearing they

6   issue nothing is what you're saying?

7       MS. SOBEL:  Correct.

8       MS. PESSIS:  Okay.  Well, see, I don't know,

9   because all I have is what you've given me.

10      MS. SOBEL:  I've given you what they have.  But

11  I'm just telling you, based on the amount of time

12  I've spent appearing on citations for Venice and

13  skid row, they do not issue any paperwork if it's

14  dismissed.

15  BY MS. PESSIS:

16      Q.     Okay.  So you were told a reason why it

17  was dismissed when you were in court?

18      A.     He asked me, "Is your vehicle have

19  handicap plates?"  I say, "Yes."  "You dismissed."

20  That's all he said.

21      Q.     And again, it's your testimony that the

22  disabled license plates were on your vehicle --

23      A.     Yes.

24      Q.     -- on November 3, 2010?

25      A.     Yes.

Cheyenne Desert Rain    August 9, 2011

1        Q.       On the front and back of the vehicle?

2        A.       Yes.

3        Q.       Okay.  On how many occasions did you

4   have to go to any type of hearing or meeting in

5   relation to the ticket written by Officer Prince?

6        A.       Okay.  Once to go to the department

7   of -- I mean, the parking violation.  Second time to

8   go ask for personal hearing so one, two -- two.

9        Q.       Two times?

10        A.       Okay.  Count to one to the parking,

11   then they send me paperwork said that they -- they

12   don't agree whatever.  Then I went into another

13   office to file for personal hearing; so that second

14   time.  The third time was to go into the hearing,

15   personal hearing.

16        Q.       Now, which entity dismissed the ticket?

17        A.       In certaining the handicap plates.

18        Q.       No.  What I'm trying to find out is:

19   Was it a court, or was it some type of review board?

20        A.       I guess it's review board.  It's

21   downstairs somewhere.

22        Q.       Okay.  So you didn't go to court on

23   this particular ticket --

24        A.       No.

25        Q.       -- correct?

EXHIBIT 2 - PAGE  87

```
 1                    Okay.  Now, on the first ticket we
 2      talked about, you did file an appeal in the Superior
 3      Court; correct?
 4           A.      Yes.
 5           Q.      Okay.  And it's my understanding, based
 6      on the paperwork that I've read which was provided
 7      by Ms. Sobel, that the ticket was initially affirmed
 8      during the review process.  You then filed an
 9      appeal --
10           A.      Yes.
11           Q.      -- and then it was dismissed --
12           A.      Yes, reversed.
13           Q.      -- or found invalid; correct?
14                   Okay.  And did you get your money back?
15           A.      I didn't pay anything.
16           Q.      Okay.  You didn't pay --
17           A.      No.
18           Q.      -- you did a fee waiver?
19           A.      Yes.
20           Q.      Okay.  So you didn't pay anything on
21      that ticket?
22           A.      No, nothing.
23           Q.      Okay.  Now, jumping back to ticket from
24      November 3, 2010 --
25           A.      Yes.
```

```
 1          Q.      -- did you pay a fee on that one?
 2          A.      No.
 3          Q.      Okay.  So you are not out of pocket any
 4     money for fees --
 5          A.      Right.
 6          Q.      -- in relation to these citations?
 7          A.      Right.
 8          Q.      Okay.  Did you incur any expenses
 9     otherwise in relation to these two citations that
10     we've talked about?
11          A.      Expense in the gas, my timing.
12          Q.      Okay.  So gasoline?
13          A.      Of course.  But, you know, I'm not
14     going to be write down there "I want 50,000," no.
15          Q.      Okay.  Earlier you mentioned that you
16     sell art; is that correct?
17          A.      Yes.
18          Q.      Okay.  Are you making a claim in this
19     case that you've lost money in relation to selling
20     art because of these citations?
21          A.      No.
22          Q.      Okay.  With regard to your gas expenses
23     relating to the challenges to these citations, how
24     much do you think you've spent on gasoline?
25          MS. SOBEL:  I think the witness just testified
```

```
 1    BY MS. PESSIS:
 2        Q.      So how would you say that these two
 3    citations have affected you emotionally, if at all?
 4        A.      Anytime I have to do -- deal with
 5    people and long period of time, that's bother me.
 6    Now, was Officer Prince get into my emotion?  No.
 7    The one that bothered me the most was the first one
 8    because that was a lie.  Okay?  I don't like people
 9    lie on me, and I don't believe police officers
10    shouldn't do that to anyone.
11        Q.      Okay.  So you feel that the ticket
12    written by Officer Quesada was something that's more
13    upsetting to you versus the second citation?
14        A.      Yes.
15        Q.      Okay.  Are you claiming that Officer
16    Prince has done anything to hurt you intentionally?
17        A.      No.
18        Q.      Okay.  So can you explain to me how, if
19    at all, the citations have affected you.  In other
20    words, do you feel that you can't do anything that
21    you used to do before the citations?
22        A.      Before citation, I can get out and walk
23    around, exercise which is I have to do that all day
24    long to keep my nerve and muscular things moving.
25    If I sit still, I will be paralyzed, and I don't
```

1      A.      '87.

2      Q.      Okay.  And can you tell me what

3   condition that car is in.

4      A.      Car broke down, not working.

5      Q.      Now, where did you keep that car?

6      A.      Right now?

7      Q.      Well, in 2010 when you got these

8   citations, where did you keep that car?

9      A.      Most of the time I park in

10  Santa Monica.

11     Q.      Okay.  And when you would drive that

12  car -- if you would use that car from Santa Monica,

13  how far would you drive with it usually?

14     A.      From, let's say, Pico to Rose Avenue.

15     Q.      Okay.  And did you use the car for any

16  longer trips like out to Reseda or anything?

17     A.      No.

18     Q.      Okay.  And why are you smiling?

19     A.      Because that's funny.

20     Q.      Why is that funny?

21     A.      When I drive the car to Reseda and try

22  to come one day, it's broke down on the 405 Freeway.

23     Q.      Okay.  So would it be correct that you

24  only use that car to drive a few blocks from

25  Santa Monica to the beach --

EXHIBIT 2 - PAGE  91

# PARKING VIOLATION

DT 5501 / C6-03

## City of Los Angeles    1087101540

| Month | Day | Year | Time | Meter Number | PPD# |
|-------|-----|------|------|--------------|------|
|       |     |      |      |              |      |

**VEHICLE LICENSE NUMBER**

VIN

| LICENSE | STATE | LIC YEAR | MONTH | BODY TYPE | | | |
|---------|-------|----------|-------|-----------|-----|-----|-----|
| CA | Other | | | PASS | TRUCK | MOTOR CYCLE | Other |

**VEHICLE MAKE (CIRCLE)**     OTHER     COLOR

| CHEV A | BUICK B | CADI C | PLYM D | VOLK E | TOYT F |
|--------|---------|--------|--------|--------|--------|
| FORD G | OLDS H | PONT I | DODG J | HOND K | NISS L |

LOCATION                                    BEAT NO.

OFFICER                      SERIAL NO.      ISSUING AGENCY

NOTES                                        SQUAD NO.

                                             SUPERVISOR NO.

| VIOLATION | | VIOLATION | |
|-----------|----|-----------|----|
| [1] 88.13B M.C. Meter Violation | $50 | [9] 80.56E (4) M.C. Red Zone | $80 |
| [2] 80.69C M.C. In excess of Posted ___ hr. limit | $45 | [10] 80.56 M.C. (E1) White, (E2) Yellow, (E3) Green | $45 |
| [3] 80.69A M.C. No Stopping | $80 | [11] 80.61 M.C. Alley | $55 |
| [4] 80.69A M.C. No Stopping   A.M. | $80 | [12] 22500N CVC Bus Zone | $280 |
| [5] 80.69A M.C. No Stopping   PM. | $80 | [13] 22500 F CVC On Sidewalk | $55 |
| [6] 80.69B M.C. No Parking | $60 | [14] 22507.8 CVC Handicapped Space A, B, C(1), C(2) | $345 |
| [7] 80.69B M.C. No Parking, Street Cleaning | $60 | [15] 22514 CVC Fire Hydrants | $55 |
| [8] 80.58L M.C. Pref. Parking Permit | $55 | [35] 80.70 MC Anti Gridlock | $150 |
| | | [ ] Other _____ $____ Amount may increase if not first violation. | |

Mail check or money order made payable to the CITY OF LOS ANGELES in THIS envelope. Write the citation number on the check. You have 21 days to pay or contest this citation. If you fail to pay or contest timely, the parking penalty will increase.

### SEE REVERSE SIDE FOR IMPORTANT INSTRUCTIONS.
### — PAYMENT MUST BE IN U.S. FUNDS —

## DO NOT SEND CASH OR
## NON U.S. BANK PAYMENTS
### TO SEAL REMOVE TAPE
### UNDER FLAP

DESERT RAIN PL 000032

*DEFTS'*

Exhibit 4
*Desert Rain*
8/9/11
Pamela S. Harris, CSR 399

EXHIBIT 2 – PAGE 92

*EX. 4*

# PARKING VIOLATION

DT 5001 / 06-09

## City of Los Angeles   1087397102

| Month | Day | Year | Time | Meter Number | PPD# |
|-------|-----|------|------|--------------|------|
| | | | | | |

**VEHICLE LICENSE NUMBER**

| | | | | | |
|--|--|--|--|--|--|

**VIN**

| | | | | | |
|--|--|--|--|--|--|

| LICENSE | STATE | LIC YEAR | MONTH | | BODY TYPE | | |
|---------|-------|----------|-------|---|-----------|---|---|
| CA | Other | | | PASS | TRUCK | MOTOR CYCLE | Other |

**VEHICLE MAKE (CIRCLE)** | **OTHER** | **COLOR**

| CHEV A | BUICK B | CADI C | PLYM D | VOLK E | TOYT F | | |
|--------|---------|--------|--------|--------|--------|--|--|
| FORD G | OLDS H | PONT I | DODG J | HOND K | NISS L | | |

**LOCATION** | **BEAT NO.**

**OFFICER** | **SERIAL NO.** | **ISSUING AGENCY**

**NOTES** | **SQUAD NO.**

**SUPERVISOR NO.**

| | VIOLATION | | | | VIOLATION | |
|--|-----------|--|--|--|-----------|--|
| 1 | 88.13B M.C. Meter Violation | $50 | | 9 | 80.56E (4) M.C. Red Zone | $80 |
| 2 | 80.69C M.C. In excess of Posted ___ hr. limit | $45 | | 10 | 80.56 M.C. (E1) White, (E2) Yellow, (E3) Green | $45 |
| | | | | 11 | 80.61 M.C. Alley | $55 |
| 3 | 80.69A M.C. No Stopping | $80 | | 12 | 22500i CVC Bus Zone | $280 |
| 4 | 80.69A M.C. No Stopping   A.M. | $80 | | 13 | 22500 F CVC On Sidewalk | $55 |
| 5 | 80.69A M.C. No Stopping   PM. | $80 | | 14 | 22507.8 CVC Handicapped Space A, B, C(1), C(2) | $345 |
| 6 | 80.69B M.C. No Parking | $60 | | 15 | 22514 CVC Fire Hydrants | $55 |
| 7 | 80.69B M.C. No Parking, Street Cleaning | $60 | | 35 | 80.70 MC Anti Gridlock | $150 |
| 8 | 80.58L M.C. Pref. Parking Permit | $55 | | | Other ___ $___ Amount may increase if not first violation. | |

Mail check or money order made payable to the CITY OF LOS ANGELES in THIS envelope. Write the citation number on the check. You have 21 days to pay or contest this citation. If you fail to pay or contest timely, the parking penalty will increase.

SEE REVERSE SIDE FOR IMPORTANT INSTRUCTIONS.
— **PAYMENT MUST BE IN U.S. FUNDS** —

## DO NOT SEND CASH OR NON U.S. BANK PAYMENTS

DESERTRAIN PL  000028

TO SEAL REMOVE TAPE
UNDER FLAP

*Ex.7*



DEFT'S

Exhibit _____
Desert Rain
8/9/11
Pamela S. Harris, CSR 390

EXHIBIT 2 — PAGE  93

20 JAN 2011

CONTACTED PARKING VIOLATIONS

BUREAU RE 1087397102
CHEYENNE DESERTRAIN
DARLENE OPERATOR # 152

SAID RESPONSE SENT

TO WRONG ADDRESS

SHE WILL HAVE SOMEONE

REVIEW & RESPOND (AGAIN)

W/IN 5 DAYS TO
    PO BOX 1201 VENICE 90294

NO EXTRA FINES ASSESSED

DESERTRAIN PL 000050

EXHIBIT (2 EX. PAGE 94

artwallah 2210 Lincoln Blvd. suite #5 Venice CA 90291
tel:310.391.3330 fax:310.391.1066 www.artwallah.org info@artwallah.org

Fostering Expressions of the South Asian Diaspora

```
1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF LOS ANGELES    )

3

4         I, PAMELA S. HARRIS, Certified Shorthand

5    Reporter, certificate No. 3909, for the State of

6    California, hereby certify:

7         The foregoing proceedings were taken before me

8    at the time and place therein set forth, at which

9    time the deponent was placed under oath by me.

10        The testimony of the deponent and all

11   objections made at the time of the examination were

12   recorded stenographically by me and were thereafter

13   transcribed;

14        The foregoing transcript is a true and correct

15   transcript of my shorthand notes so taken;

16        I further certify that I am neither counsel for

17   nor related to any party to said action nor in any

18   way interested in the outcome thereof.

19        IN WITNESS WHEREOF, I have hereunto subscribed

20   my name this ____2_2_nd__ day of ___August_____,

21   20 _11_.

22

23

24                    _Pamela S. Harris_____
                      Pamela S. Harris, C.S.R. No. 3909
25
```

EXHIBIT 23  PAGE 96