CAROL A. SOBEL   SBN 84483
429 Santa Monica Boulevard, Ste. 550
Santa Monica, CA  90401
T. 310 393-3055   F. 310 393-3605
E. carolsobel@aol.com

BARRETT S. LITT  SBN 45527
LITT, ESTUAR & KITSON LLP
1055 Wilshire Boulevard, Ste 1880
Los Angeles, CA 90017
T. 213 386-3114   F. 213 380-4585
E. blitt@littlaw.com

LEGAL AID FOUNDATION
  OF LOS ANGELES
SUSAN MILLMANN  SBN 92417
1640 5th Street,  Ste 124
Santa Monica, CA 90401
T. 310 899-6200  F. 310 899-6208
E. smillmann@lafla.org

MICHAEL S. RAPKIN   SBN 67220
SCOTT B. RAPKIN   SBN 261867
LAW OFFICE OF MICHAEL RAPKIN
233 Wilshire Boulevard, Suite 700
Santa Monica, CA 90401
T.  310 319 5465   F. 310 319 5355
E.  scottrapkin@rapkinesq.com

**IN THE UNITED STATES DISTRICT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| CHEYENNE DESERTRAIN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | CASE NO. CV 10-09053 RGK (PJWx)<br><br>**CORRECTED** PLAINTIFFS'<br>STATEMENT OF UNCONTROVERTED<br>FACTS IN SUPPORT OF PARTIAL<br>SUMMARY JUDGMENT/SUMMARY<br>ADJUDICATION<br><br>Date: October 17, 2011<br>Time: 9:00 a.m.<br>Ctrm: Roybal 850 (Hon. R. Gary Klausner) |

| # | Uncontroverted Material Fact | Source |
|---|---|---|
| 1 | Just prior to a Town Hall meeting in late September, 2010, where Chief Beck and Councilman Rosendahl spoke to the Venice Community, Capt. Peters met with Chief Beck and presented the Chief with "an operational plan to address the issues." | Peters: 56:20-57:20 |
| 2 | As the Capt. III in Pacific Division, Capt. Peters was delegated by Chief Beck to make decisions about how 85.02 would be enforced. | Peters: 129:1-129:7 |
| 3 | Capt. Peters wanted to find a parking lot where people could stay overnight. As of the date of his deposition, no sites exist for homeless vehicle owners to park under Streets to Homes or any other program. | Peters: 28:23-30:17; Ex. 7 |
| 4 | When Peters started working on the homeless issues, he sent supervisors to cities with similar programs to assess best practices. None of the observations made at these other cities have been implemented. | Peters: 75:6-76:15 |
| 5 | Initially, when Peters started at Pacific, he learned the information handed out to homeless people as Local Resoures was not accurate. The packet was revised. | Peters:44:9-44:25; Ex.5, 6 |
| 6 | Defendants received complaints about large RVs in the vicinity that were alleged to have dumped debris. | Peters: 23:4-23: 8 |
| 7 | Capt. Peters believed that if persons stayed at a shelter at night and returned to their vehicles during the day they would not violate 85.02, but no training was given to the officers on this and all of the officers were trained and acted otherwise. | Peters: 50:7-52:10; *cf. Sep. Statement Facts #13, 26, 31, 43, 52* |
| 8 | Pacific Captain Hiltner issued a document in 2008 to instruct officers on dealing with situation of homeless persons and vehicles, particularly LAMC 85.02. | Peters:77:1-77:15; Ex.6 |
| 9 | Capt. Peters fosters broad discretion in enforcement, following a philosophy of "Four Cs": commander's | Peters: 82:1-83:11; Ex.3 |

1

| | | |
|---|---|---|
| | intent (Peter's ultimate goal), constitutional policing (following law), Community (impact on community), Compassion. This was incorporated as direction in the Venice Task Force Operational Plan. | |
| 10 | Sgt. Reina wrote the operation plan after discussions and roundtable meetings with a number of people. It is consistent with Capt. Peters' direction to the officers under his command in Pac. Div. re: the Task Force. | Peters: 86:19-87:6; Ex. 3 |
| 11 | Officers assigned to the Venice Homeless Outreach Task Force were given 20 minutes of informal training by a Sgt. and a packet titled Local Outreach Resources and told to give copies with warnings about violating 85.02. They later received training of about 15-20 min. by Claudia Martin. The officers were also provided exemplars to follow, depicted in Exhibit 4. | Yoshioka: 61:12-63:1; Gonzales: 20:19-22:23; 25:24-27:17; 38:18-40:8; Prince: 35:16-35:25; Ex. 4 |
| 12 | Claudia Martin provided the only training on 85.02, consisting of 15-20 minutes in April 2010 and 2011. She needed the following for prosecution: give a warning on the first contact, try to provide shelter information, give community resources to try to assist against an 85.02 violation, and take photos during a citation or arrest. Capt. Peters was present and spoke at the training, too. | Peters: 97:1-97:6; 99:3-100:2 Yoshioka: 30:13-33:12; 34:5-35:15 |
| 13 | Officers were never trained as to how a person could avoid an 85.02 violation, such as staying in a shelter during the day or keeping their belongings elsewhere. There was no time that 85.02 didn't apply. It did not have to be overnight or day-by-day, regardless of where a person stayed at night. | Yoshioka:105:2-105:21; 106:16-107:6; 170:17-171:10 Gonzales:31:3-32:18; 56:7-60:1 |
| 14 | The mission of the Venice Homeless Outreach Task Force was to look for people that live in their RVs or dumped hazardous materials out of their RVs and to deal with transient and illegal activity such as | Yoshioka: 22:18-22:21; 35:16-35:25; Ex. 1 |

2

| | | | |
|---|---|---|---|
| | | trespass, drinking in public, adhering to the times in which they could sleep on the sidewalks, with an emphasis on citations for 85.02. | |
| | 15 | The "Warning" was given to those suspected of violating 85.02 so that they would be aware of the municipal code. | Yoshioka: 75:2-75:7; Ex. 2 |
| | 16 | An 85.02 citation is not a normal traffic citation: it is an arrest and a release from custody on the arrestee's own recognizance. | Yoshioka: 33:20-34:4 |
| | 17 | The officers were trained that if someone were sleeping in or using a vehicle at night, he could also be cited during the day, but Yoshioka was not trained that someone would have to be in his vehicle more than one day at a time to be violating 85.02. | Yoshioka: 35:16-35:25 |
| | 18 | Yoshioka received informal training from Sgt. Reina when he joined the Task Force in October 2010, but it was no different than Claudia Martin's training. | Yoshioka: 36:4-37:1 |
| | 19 | Sgt. Reina trained that living quarters meant anything one would do usually in an apartment or house - eating, sleeping, "hanging out" - with evidence of food, water, basic necessities, medication, toiletries, bedding, personal property such as clothing, books, computers - anything that would show a person was spending a good amount of time in the vehicle. There were no other definitions of the terms. | Yoshioka: 37:2-37:17; 182:21-183:16 |
| | 20 | No law makes it illegal to eat in a car, take a nap in a car, hang out or listen to the radio in the car while legally parked, have medication or toiletries in the car, or books, blankets, clothes, or other personal items. | Yoshioka: 37:18-39:21; 100:22-101:14; |
| | 21 | It's the combination of things plus parking on a city street. No items are more indicative than others of somebody living in their car. | Yoshioka: 39:22-41:1 |

3

| | | | |
|---|---|---|---|
| | 22 | It is illegal to park a vehicle on a public street or parking lot any time of day or night if used as living quarters. | Gonzales: 40;18-40:24; Ex. 2 |
| | 23 | Yoshioka did cite Cagle without first issuing a warning since Cagle said he was familiar with 85.02 | Yoshioka: 63:2-63:18; Ex. 36 |
| | 24 | Yoshioka arrested Will Cagle for violating §85.02 on 11/22/2010 at 6:45am | Yoshioka: 85:18-86:21; Ex. 36 |
| | 25 | Yoshioka doesn't have a set time he gives to violators of 85.02 before citing them again, but a month was fair: he didn't ask if a person tried to get resources. | Yoshioka: 89:12-90:9 |
| | 26 | Yoshioka does not recall asking whether Cagle slept on the sidewalk the night before, but it would not have made a difference. It did not matter whether they slept the night before, or if they slept on a sidewalk. | Yoshioka: 97:8-98:18; see also Prince: 50:23-52:12 |
| | 27 | Yoshioka can't recall an instance where someone said they were staying in a shelter but Yoshioka did not issue a citation/arrest for violation of 85.02. | Yoshioka: 101:15-103:6; |
| | 28 | Yoshioka was not aware that shelters do not allow people to stay there during the day because he knows nothing about how the shelters operate. | Yoshioka: 103:15-105:1 |
| | 29 | A person would violate 85.02 if their belongings are in a car and it is set up to "live in," but to be cited, the person must be present. | Yoshioka:105:22-106:15 |
| | 30 | It is not illegal to have the same items that would support an 85.02 violation if in a car when in a shopping cart. | Yoshioka: 98:19-100:21; 107:7-108:11; Gonzales: 42:15-43:25; 93:4-93:14; Prince: 52:13-54:1 |
| | 31 | The officers were not trained as to how one could avoid an 85.02 violation if he had a car but no home. There was no time that 85.02 did not apply. | Yoshioka: 105:2-107:6; Gonzales 36:16-38:17[ 56:7-60:1 Yoshioka: |
| | 32 | Yoshioka first met plaintiff Taylor on Oct. 29, 2010. | Yoshioka: 123:8-124:18; |

4

| | | | |
|---|---|---|---|
| | | He told Taylor he could not live in his car. He never heard complaints from anyone about Chris Taylor. | Taylor: 127:14-18 |
| | 33 | Yoshioka wrote the 12/18/10 arrest report for Taylor, stating Taylor was warned on 10/29/10 but he did not have contact with him from then until the arrest | Yoshioka:131:19-132:16; Ex. 8, 9 |
| | 34 | Yoshioka had discretion to cite and release Taylor but arrested him as he thought he would still violate 85.02 based on what Taylor said then, not Taylor's conduct between 10/29/10 and 12/18/2010. | Yoshioka: 133:3-136:24; 139:3-139:25 |
| | 35 | Yoshioka can't recall what Taylor said to make him believe he would still violate 85.02. Taylor was sitting in the back seat, the car door was open and another man was standing outside of the car speaking to Taylor. He was not sleeping; it was raining out. | Yoshioka: 139:13-141:6; Taylor: 102:6-14 |
| | 36 | No law makes it illegal to sit in the back seat of a care while talking to somebody outside of the vehicle with a sleeping bag also in the back seat. It is not illegal to have in a car any of the items Taylor had when arrested. Taylor had a sleeping bag housed or not. | Yoshioka: 141:7-142:3; Taylor:141:2-24 |
| | 37 | Taylor said he was staying at a shelter, but Yoshioka doesn't recall if this made him reconsider arresting Taylor. Staying at a shelter would not matter as his car was "set up" to live. Taylor was out of the car all day, slept on the sidewalk or at shelter at night; kept a storage unit for his property; and had no stored food. Taylor had 5 books, the rest were in his storage unit. | Yoshioka: 142:4-146:15; Taylor: 15:1-3; 89:20-90:6; 91:13–92:10; 126:6-19; 127:14-25; 133:5-134:9; 136:20-138:25; 142:7-14; Ex. 10a-c |
| | 38 | Yoshioka had Taylor's vehicle impounded. | Yoshioka:150:16-150:25; Ex. 9 |
| | 39 | Yoshioka had no reason to believe Taylor slept in his vehicle the night before his arrest. | Yoshioka: 151:15-152:18 |
| | 40 | Yoshioka recalls talking with Elstein about the fact that he was staying elsewhere at night, but responded | Yoshioka: 164:12-165:6 |

5

| | | |
|---|---|---|
| | that it was not just sleeping in a car that was barred but also the condition of a car and parking on city streets. | |
| 41 | On 1/30/11, Yoshioka approached Jacobs-Elstein at Penmar Park when plaintiff was sitting in his vehicle. The encounter lasted about 20 minutes. | Jacobs-Elstein: 156:16-159:22 |
| 42 | Jacobs-Elstein tried to show Yoshioka the permission letter from Palms Court, but Yoshioka ignored him. | Jacobs-Elstein: 162:12-1:18; Ex. 15 |
| 43 | Officers had full discretion to determine whether to issue a citation. Even if a person stayed at shelters they could be violating 85.02. | Yoshioka: 167:12-171:10; 178:4-179:12 Gonzales: 33:18-34:8; 36:7-36:10; Prince 47:25-50:22 |
| 44 | There is nothing independently illegally about having clear plastic boxes of salads, a portable radio or water bottles in a vehicle. | Yoshioka: 171:19-172:17 |
| 45 | The fact that a person may need cover from the rain would not have any relevance to a 85.02 violation. | Yoshioka: 173:1-174:13 |
| 46 | For Taylor, Cage and Jacobs-Elstein, there was no evidence that any of them stayed in their vehicles overnight or occupied the vehicle for 3 or more days. | Yoshioka: 184:19-185:18 |
| 47 | Warivonchick was the only time that Yoshioka recalls pulling over someone for keeping a blinker light on. | Yoshioka: 191:11-191:18 |
| 48 | Yoshioka did not observe anything to suggest Warivonchik was violating 85.02 since she was in a moving vehicle. | Yoshioka: 194:15-194:19 |
| 49 | Gonzales handed the Local Resource pamphlet to persons thought to be living in vehicles. She never checked the resources. She expected that the individuals would call the numbers and get help. | Gonzales: 38:18-40:8 |

6

| | | | |
|---|---|---|---|
| 1, 2 | 50 | Taking advantage of some resources listed would not avoid a violation of 85.02. | Gonzales: 48:15-49:14 |
| 3, 4, 5, 6 | 51 | If someone tried to take advantage of the resources listed in the local outreach packet, and then drove to the services but parked on a public street, they would still be violating 85.02. Gonzales probably would not cite the person if she saw him trying to get help. | Gonzales: 140:8-143:21 |
| 7, 8, 9, 10, 11 | 52 | Prior to April 2010, Prince had never received any training regarding 85.02. Prince has not been trained on whether 85.02 is violated if a person does not sleep in his car at night, but the training he received did not give a time frame. He has never discussed if a person violates 85.02 if he does not sleep in his car at night. | Prince: 16:21-18:5; 47:11-47:24 |
| 12, 13 | 53 | Prince discussed with his partner whether they should arrest someone who seemed to be trying to get off the streets and they found the individual to be credible. | Prince: 62:18-64:8 |
| 14, 15, 16 | 54 | When Gonzales saw Elstein on 9/13/10, he was sitting in his vehicle. He wasn't sleeping. She cited him for violating 85.02 | Gonzales: 73:10-74:10 |
| 17, 18, 19 | 55 | On 10/31/2010, Gonzales observed Elstein, seated in the driver's seat, awake, and appeared to be changing something on a radio hanging from his rearview mirror or the roof. She issued him a citation. | Gonzales: 87:10-88:6; 101:25-103:7 |
| 20, 21, 22, 23 | 56 | Jacobs-Elstein was sitting in his car on 10/31/10 and had just parked for about five minutes and was going to walk a friend's dog for her. His engine was still hot. | Jacobs Elstein: 93:17-94:3; 106:9-106:14; 107:10-107:17; 108:3-108:25. |
| 24, 25, 26 | 57 | Gonzales detained Elstein on the sidewalk. He was handcuffed. Her partner searched Elstein's car but Elstein was not asked for his consent. She arrested him for violating 85.02. | Gonzales: 91:1-92:15; Jacobs-Elstein Declaration at ¶¶ 6-15; Ex. 17, 20, 22 |

7

| | | |
|---|---|---|
| 58 | Gonzales never asked Elstein, on any occasion, where he stayed in between the times that she saw him. | Gonzales: 130:4-130:9 |
| 59 | Even when was standing at the church he might be violating 85.02 based on where he parked and what he had in his vehicle. He could only be cited and questioned under 85.02 if parked on public property. | Gonzales: 137:8-140:7 |
| 60 | Gonzales did not ask Elstein on 10/31/10 what resources he had used because he had already received a warning and citation before she arrested him. | Gonzales: 145:6-145:18 |
| 61 | On 1/30/11, Yoshioka approached Jacobs-Elstein at Penmar Park, where he was sitting in his vehicle. | Jacobs Elstein: 156:16-159:22 |
| 62 | On 01/30/11, when Yoshioka informed Jacobs-Elstein that he could not live in is vehicle, Jacobs-Elstein responded that he was not living in his car and attempted to show the permission letter from Palms Court, but the officer ignored him. | Jacobs-Elstein: 162:12-1:18; Ex. 15 |
| 63 | Jacobs-Elstein received sheets of paper with shelter information from Officer Murray. | Jacobs-Elstein:193:6-193:13; Ex. 5 |
| 64 | The hours that shelters are open would not have prevented Jacobs-Elstein from being cited for 85.02 since he would have to be out of the shelter by 5:00am | Jacobs Elstein: 194:6-194:12 |
| 65 | William Cagle was cited for 85.02 in Oct., 2010 and handcuffed and arrested for 85.02 a month later. The charges against him were dismissed. | Cagle: 43:9-46:14; 103:8-105:8; 108:18-109:9; Ex. 36 |
| 66 | When arrested, he was sitting upright in his vehicle in the driver's seat, awake, looking out of the window. That night, he had slept on the streets. He was not sleeping in his vehicle overnight. | Cagle: 46:15-52:4 |
| 67 | In the morning he would retreat to his car and look out of the window. Prior to October 17, 2010, he knew he couldn't sleep on the sidewalk past 6:00am, and he knew it was illegal to live in his vehicle; he was not | Cagle: 52:5-55:25; 129:15-22 |

8

| | | |
|---|---|---|
| | living in his vehicle. | |
| 68 | Cagle has been disabled for 5 years. He has heart trouble, shortness of breathe and both legs swell, making it painful to walk more than a block or two. | Cagle:17:6-17:21; 18:17-20:17; 132:5-133:1 |
| 69 | Brad Eckhart has lived in Venice for nearly two decades. He is on disability following a car accident that shattered his foot, causing chronic pain and requiring him to use a cane. | Eckhart: 18:12-22; 21:24-25; 107:18-25 |
| 70 | Eckhart drives a vehicle with disability plates, which were on his vehicle when he was issued a parking citation for a 2-hour violation on 11/3/10. | Eckart:22:25-23:7; 105:19-25; 111:1-13; Ex. 28 |
| 71 | Eckhart was also issued a citation on January 29, 2011 for an oversized vehicle parked where a sign stated permit parking was allowed, but he did not have notice of the citation until 3 months later. The citation was dismissed upon appeal. | Eckhart: 61:12-25; 68:6-11; 75:1-11; 76:22-25; 77:25; 79:1-6; Ex. 29 |
| 72 | Eckhart received another citation on July 19, 2011 for oversized vehicle despite the exemption extended to him due to his disabled plates. He wrote a letter to the Parking Violation Bureau on July 23, 2011. In response the bureau denied administrative review. | Eckhart: 85:24-25; 89:13-23; 90:1-17; 90:23-25; Ex. 30, 32 |
| 73 | Desertrain was cited 9/13/10 pursuant to a posted sign barring parking vehicles over 6 feet. | Ex. 26; Desertrain:30:20; 32:14-32:23; 35:24-37:13 |
| 74 | On 10/16/10, Desertrain was in her RV, parked on Hampton and getting ready to walk her dog before heading back to Reseda when she heard a kicking sound against her RV and saw 2 officers on bikes. She had just driven from the Rose Ave. parking lot. | Desertrain: 52:12-57:5 |
| 75 | Her citations have all been upheld initially, then dismissed on appeal. | Desertrain: 94:4-94:5; 97:5-97:12 |

9

| | | |
|---|---|---|
| 76 | Prince issued 3 tickets at the same time and location to plaintiffs' vehicles with disability plates for exceeding the 2 hour parking limit on November 3, 2010. | Prince: 90:22-92:23; 94:20-96:21; Ex. 27, 28, 36 |
| 77 | One citation was issued to Cagle, one to Desertrain, and one to Eckhart. | Cagle: 72:3-75:22; Desertrain: 80:17-81:6; Ex. 27, 28, 31, 35 |
| 78 | Desertrain arrived while Prince was writing the citations and stated that she was exempt from the 2 hour limit parking sign as a disabled driver | Desertrain: 90:9-90:12; Ex. 25 |
| 79 | Prince was never trained by anyone regarding parking enforcement and disabled persons' license plates. | Prince: 71:10-71:21; 78:1-78:15 |
| 80 | As a result of the citations, Eckhart has experienced an increase in anxiety, fear of getting towed and losing his dog. Despite the fact that Venice is his home, the citations have been a source of frustration and worry since he's had to go to court. Due to his injuries, it is difficult for him to take public transportation. | Eckhart Depo at 102:25; 103:1-6; 104:7-25; 105:1-8; 108:11-25; 113:3-9 |
| 81 | On 11/13/10, Patty Warivonchik was stopped by Officer Murray for having her left turning signal on while traveling through Venice in her RV for more than a mile. Murray admitted to following her. She was not cited; however, for 20 minutes, Officer Murray warned her about 85.02 and threatened Warivonchik that she would be arrested and her vehicle impounded the next time he found her parked in Venice. | Warivonchik: 10:23-25; 11:17-23; 31:6-7; 39:14-38:20; 40:3-11; 40:19-41:5; Ex. 34 |
| 82 | Warivonchik sold her RV in February 2011 in order to avoid being arrested, hassled and/or harassed by the Venice Task Force. | Warivonchick: 55:5; 55:8-10; 55:11-55:15 |
| 83 | Jacobs-Elstein went to court on the 10/31/10 arrest. | Jacobs-Elstein:136:18- |

10

| | | |
|---|---|---|
| | The City Attorney's office put a hold on the citation; it was not rejected. Jacobs-Elstein was told by the receptionist at the City Attorney's office that if he didn't get notice within a certain period of time stating that the prosecution would proceed, that they wouldn't. | 137:1; 138:7-138:10; Ex. 19, 20, 21 |
| 84 | Jacobs-Elstein received papers with shelter information from Officer Murray. | Jacobs-Elstein: 193:6-193:13 |
| 85 | Desertrain was told by Officer Prince that he had been directed by his supervisors to clean up the streets of vehicles parked by people who are on the streets and don't want help because they need to get out of Venice. | Desertrain: 90:13-91:11 |
| 86 | Warivonchik was not living in her RV in 2010. | Warivonchick: 19:16-21 |
| 87 | Leroy Butler is an artist and musician. He is disabled and lives in an RV in Venice. At all relevant times, he had disability license plates affixed to the front and back of his RV. | Butler: 13:16-20; 13:22-23; 16:18-20; 19:20-24; 41:1-5; Ex. 45 |
| 88 | Butler has been issued 3 citations from LAPD. The first for failing to move his vehicle within 72 hour period, the next two were citations for parking an oversized vehicle. | Butler: 16:9-12; 21:9-13; 50:9-20; Ex. 3, 44, 46 |
| 89 | Butler read the DMV materials that accompanied his disability plates, which informed him that his disability plates exempted him from certain parking restrictions. | Butler: 39:18-25 |
| 90 | Defendants are not aware of any complaints from the community regarding any of the plaintiffs in this case. | Yoshioko: 57:17-58:5; 94:11-95:16; 198:17-198:19<br>Gonzales: 71:17-71:21; |

| | | Prince: 109:7-109:14 |
|---|---|---|
| 91 | Butler has experienced pain and suffering from the citations because the inability to use his RV has forced him to walk farther. Also he had to destroy a couple of vehicles and purchase a truck for work. | Butler: 60:5-22 |
| 92 | Cagle can't get around like he used to with a car so that he can use services offered in downtown or visit a doctor. His doctor is in Culver City. He can take the bus but it's easier if someone drives him. | Cagle:129:23-131:14 |
| 93 | Cagle had a disability placard on his vehicle in 2010. The vehicle, a 1991 van, was eventually impounded. | Cagle: 20:18-22:8; 40:3-41:3; Ex. 50 |
| 94 | | |
| 95 | Cagle believed the parking restrictions shown on the sign posted where he parked did not apply to him because he was displaying his disability placard. | Cagle: 87:1-88:10; Ex. 50 |
| 96 | Desertrain has had a disability plate issued by the DMV for over 10 years. | Desertrain: 38:20-39:7 |
| 97 | Cagle has been disabled for 5 years. He has heart trouble, shortness of breathe and both legs swell, making it painful to walk more than a block or two. | Cagle:17:6-17:21; 18:17-20:17; 132:5-133:1; Ex. 37 |
| 98 | Cagle went to court on the October 17, 2010 citation. He believes it was dismissed. | Cagle: 68:4-70:23 |
| 99 | Cagle was cited for parking at a 2 hour limited spot. | Cagle: 72:3-75:22; Ex. 36 |
| 100 | Cagle has a disability placard on his rear-view mirror. | Cagle: 88:11-98:15 |
| 101 | Mr. Cagle was awake, sitting up in the driver's seat at 6:45 a.m. when an officer asked him to step out. | Cagle: 101:6-103:7; 136:11-137:2 |
| 102 | After he exited the vehicle, he was handcuffed. | Cagle: 103:8-105:8 |
| 103 | Cagle's 11/22/10 arrest charges were dismissed. | Cagle:108:18-109:9; Ex. |

12

| # | Statement | Citation |
|---|---|---|
| | | 36, 38 |
| 104 | Cagle could not afford to get his car out of impound. | Cagle: 109:10-111:11 |
| 105 | Someone gave Cagle another car, but he hasn't registered it with the DMV. He fears it, too, will be seized so long as he is being targeted as homeless. | Cagle: 115:6-117:5 |
| 106 | Cagle has suffered emotional distress and depression. He stopped taking his medicine. | Cagle Depo at 126:9-127:11 |
| 107 | Without a vehicle, Cagle can't get around like he used to and can't take advantage of services offered in downtown or visit a doctor. His doctor is in Culver City. It's easier on him if someone drives him. | Cagle: 129:23-131:14 |
| 108 | Cagle had a bottle of urine in his vehicle when arrested because the public restroom at the beach is about 1-3 blocks from where he sleeps on the sidewalk. He did not want to urinate on the street. | Cagle:134:9-136:10 |
| 109 | Jacobs-Elstein operated a business placing legal personnel from 1998 until the end of 2007. | Jacobs-Elstein:16:13-16:24 |
| 110 | From December, 2007 until September, 2009, Jacobs-Elstein was mainly living in his vehicle, but at first he lived on the street until he got his car back. | Jacobs-Elstein:19:10-19:21 |
| 111 | In mid-2009, an officer informed Jacobs Elstein that a local law barred living in his vehicle. | Jacobs Elstein:23:8-24:2 |
| 112 | The officer did not tell Jacobs-Elsein the code section, but he looked it up online that same evening. | Jacobs-Elstein:32:6-32:17 |
| 113 | Jacobs-Elstein started staying at the Methodist Church parking lot in 2010 or the end of 2009. He stayed there until the end of January, 2011. | Jacobs-Elstein: 34:15-35:7; 39:17-40:18; Ex. 11, 12 |

13

| | | | |
|---|---|---|---|
| | 114 | After the Church revoked permission to stay there at night, Jacobs-Elstein stayed at a motel for a few weeks until he obtained permission to stay at Palms Court. | Jacobs Elstein: 41:15-41:22; Ex. 13, 14 |
| | 115 | The Methodist Church permitted Jacobs-Elstein to stay on the property only from 8:00pm to 8:00am. | Jacobs-Elstein: 46:25-48:10 |
| | 116 | Jacobs-Elstein helps with food and clothing distribution programs, hangs out with friends, goes to appointments, the park, the library, and does other things in the day. | Jacobs-Elstein: 48:20-49:3 |
| | 117 | Jacob-Elstein applied for Mental Health Services housing on 8/10/10. | Jacobs-Elstein: 49:4-49:17; Ex. 16 |
| | 118 | Jacobs-Elstein has a voucher from L.A. Housing Authority and he is seeking a landlord who will take it; it is difficult to find a landlord. | Jacobs-Elstein: 51:4-52:5 |
| | 119 | 10/31/10 was Jacobs-Elstein's first and only arrest. | Jacobs-Elstein:114:15; Ex. 19, 20, 21, 49 |
| | 120 | Jacobs-Elstein felt diminished and criminalized just for being down and out temporarily. | Jacobs-Elstein:188:24-188:25 |
| | 121 | Desertrain suffers from respiratory problems. | Desertrain: 9:20-11:9 |
| | 122 | Desertrain was issued a parking violation citation on 9/13/10 on her RV. | Desertrain: 30:20; 32:14-32:23; 33:6-33:8; Ex. 27 |
| | 123 | On or about 10/28/10, Desertrain was followed by a patrol car into a gas station. She had seen the same officers following plaintiff Butler driving his RV, then saw them turn and follow her. The officer told her that her brake light was broken but did not issue a citation. Upon arriving at the Rose Avenue parking lot, Desertrain and a mechanic checked her brake lights and found they were working. | Desertrain: 67:9-78:2 |

14

| | | | |
|---|---|---|---|
| | 124 | Prince told Desertrain he had been directed by his supervisors to clean the streets of vehicles of people who are on the streets and don't want help because they need to get out of Venice. | Desertrain: 90:13-91:11 |
| | 125 | Desertrain informed Officer Prince that she was exempt from the 2-hour parking limit. | Desertrain: 90:9-90:12 |
| | 126 | Desertrain is an artist and used her RV to transport her artwork, paint and tables, which she is not able to do with her other vehicle, a broken down 87 Mercedes. She no longer drives her RV to the beach. | Desertrain:118:4-118:151 01:22-102:7 |
| | 127 | Della Franco and Luis Pacheco have lived in an apartment with their young daughter in Venice since 1998. | Franco: 10:1-12 |
| | 128 | Franco and Pacheco owned a small camper since 2005 that they used as a vehicle until they were forced to sell it as a result of the ongoing harassment from neighbors and the LAPD. They were also issued a 72-hour parking violation even though they moved their RV on a daily basis. | Franco: 15:1-25; 16:1-13; 18:13-25; |
| | 129 | Franco and Pacheco had their home telephone numbers affixed to the window of the RV and they left their curtains open so as to provide notice to anyone that they were not living in the RV. | Franco: 26:14-25; 17:1-20; 22:1-25; 23: 1-3; Ex. 42 |
| | 130 | Franco and Pacheco also received a Warning of Enforcement Action for violation of 85.02 on their vehicle. | Franco: 25:14-25; 26:1-18; Ex. 2 |
| | 131 | Jacobs-Elstein is still on medical General Relief with an SSI application pending. He shows up to all of his appointments and obeys the law. He is doing everything he can to get benefits and housing | Jacobs Elstein Declaration ¶16 |

15

| | | |
|---|---|---|
| | so that he does not have to live on the streets. | |
| 132 | Jacobs Elstein has registered with the PATH (People Assisting the Homeless) Venice Vehicles to Homes Program. He has been approved for a Section 8 vouches from HUD though Section 8 but that is not a guarantee of housing. | Jacobs Elstein Declaration ¶16 |
| 133 | Because Jacobs-Elstein owns a vehicle and parks it during the day on public streets and parking lots as he goes about his business, there is no way that he can comply with §85.02 if it is illegal for a person like him, who does not have an apartment, even to park a vehicle on public property during the day regardless of the fact that he does not sleep in the vehicle on public property at night. | Jacobs-Elstein Declaration at ¶18 |
| 134 | Even if Jacobs-Elstein took advantage of any of the resources provided to him by Officer Murray in the packet depicted in Exhibit 5, he would still be in violation of §85.02. | Jacobs Elstein Declaration ¶19 |
| 135 | The first page of Exhibit 5, is a copy of LAMC §85.02 without an explanation of the law. | Jacobs Elstein Declaration ¶19; Ex. 5 |
| 136 | The second page of Exhibit 5 lists RV Parks. None of the parks listed are in the City of Los Angeles. Most are a considerable drive, the closest being in Malibu. On the next page, Dockwelier RV Park in Playa Del Rey is described as the only beach RV Park in Los Angeles County. Jacobs-Elstein is not aware of any other public RV parks in the City or County of Los Angeles. | Jacobs Elstein Declaration ¶20; Ex. 5 |
| 137 | Jacobs-Elstein could not park at Dockweiler RV Park as he does not drive a "self-contained" RV. He drives a small SUV. Moreover, even if he drove an RV, the least expensive space at Dockweiler is $55 a night. Moreover there is a 21 day limit on the number of days that one can dock | Jacobs Elstein Declaration ¶21; Ex. 5 |

16

| | | |
|---|---|---|
| | at Dockweiler. | |
| 138 | In fact none of the RV parks listed in Exhibit 5 are a realistic option for Jacobs-Elstein. Most cost at between $35-$115 a day. More importantly, they do not permit vehicles other than self contained RVs | Jacobs Elstein Declaration ¶22; Ex. 5 |
| 139 | Most phone numbers for shelters in Ex. 5 were wrong or disconnected. Daybreak is women only. | Jacobs Elstein Declaration ¶23; Ex. 5 |
| 140 | Bible Tabernacle, listed in Ex 5, requires two Bible reading sessions in order to eat breakfast and dinner there. Shelter space is available 3:30pm - 8:00am | Jacobs Elstein Declaration ¶24; Ex. 5 |
| 141 | None of the shelters listed in Exhibit 5 allow storage of personal items or permit staying during the day. | Jacobs Elstein Declaration ¶24-26; Ex. 5 |
| 142 | Jacobs-Elstein helps with food sharing programs in the Venice area. Given having food in a vehicle is one of the criteria used as proof of a §85.02 violation, storing food in his car could be used as evidence against him for a violation of the law. | Jacobs Elstein Declaration ¶27; Ex. 2 |
| 143 | Even if Jacobs-Elstein parked at the County owned and operated parking lots to appear in court on a citation, he would be in violation of §85.02 | Jacobs Elstein Declaration ¶30; Ex. 2 |

## CONCLUSIONS OF LAW

1. LAMC §85.02 is unconstitutionally vague for its failure to give fair warning of what it proscribes and because it invests boundless enforcement discretion. *City of Chicago v. Morales*, 527 U.S. 41 (1999); *Kolender v. Lawson*, 461 U.S. 351 (1983).

2. LAMC §85.02 impermissibly criminalizes "vagrancy." *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

3. LAMC §85.02 on its face and as applied violates the right to travel and movement.

17

*Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997).

4. LAMC §85.02 violates equal protection, as a law impacting a fundamental right. It fails strict scrutiny, as it is not narrowly tailored, *Nunez, supra,* and a rational basis test. *Diaz v. Brewer*, __ F.3d __, Cir. No. 10-16797 (9th Cir. Sept. 6, 2011).

5. The arrests of Jacobs-Elstein, Taylor and Cagle, seizure of their cars, and Varivonchik's detention violate the Fourth Amendment. *California v. Hodari*, 499 U.S. 621 (1991).

6. The citations issued to the disabled driver plaintiffs violate Civ. Code 54.1(e).

7. Defendants violated plaintiffs' federal and state constitutional or statutory rights by actual or attempted interference by "threats, intimidation, or coercion." Civ. Code §52.1.

8. Plaintiffs are entitled to §1983 liability against the City under *Monell v. New York City Dep't of Soc. Services*, 436 U.S. 658 (1978) and *respondeat superior* for the state claim. *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002).

Dated: September 14, 2011

Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL

/s/

By: CAROL A. SOBEL

Attorneys for Plaintiffs

18